# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 2, 2002 Session

## STATE OF TENNESSEE v. CHRISTOPHER M. FLAKE

**Appeal by permission from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 97-09256     Bernie Weinman, Judge**

---

**No. W2000-01131-SC-R11-CD - Filed August 29, 2002**

---

The defendant was charged with attempted first degree murder for shooting the victim, a pastoral counselor, at a church in Memphis, Tennessee. At trial, the facts surrounding the shooting and the defendant's guilt were not contested. Instead, the defense sought to establish the affirmative defense of insanity. See Tenn. Code Ann. § 39-11-501. The jury found the defendant guilty of attempted voluntary manslaughter, and by this verdict, implicitly rejected the insanity defense. The trial court entered a judgment in accordance with the jury's verdict, and the defendant appealed, asserting, among other things, that the insanity defense was established by clear and convincing evidence and that the jury had erred in rejecting it. The Court of Criminal Appeals agreed, modified the verdict to not guilty by reason of insanity, and remanded the case to the trial court for further proceedings in accordance with Tenn. Code Ann. § 33-7-303. Thereafter, we granted the State's application for permission to appeal to determine whether the burden of proof on the issue of insanity affects the standard of appellate review of a jury's rejection of the insanity defense. After exhaustively reviewing the record and the applicable authorities, we unanimously hold that an appellate court should reverse a jury verdict rejecting the insanity defense only if, after viewing the evidence in the light most favorable to the State, the appellate court concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of committing the offense was established by clear and convincing evidence. Applying this standard to the record in this case, a majority of this Court is of the opinion that the jury did not err in rejecting the insanity defense. Accordingly, the judgment of the Court of Criminal Appeals is reversed and the judgment of the trial court is reinstated.

## Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed; Judgment of the Trial Court Reinstated

FRANK F. DROWOTA, III, C.J.,, delivered the opinion of the court, in which JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined.

E. RILEY ANDERSON filed a concurring-dissenting opinion, in which ADOLPHO A. BIRCH, JR., J., joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General, Thomas D. Henderson and John W. Campbell, Assistant District Attorneys General, for the appellant, State of Tennessee.

David L. Raybin, Nashville, Tennessee; Leslie I. Ballin, Memphis, Tennessee, and Steven E. Farese, Ashland, Mississippi, for the appellee, Christopher M. Flake.

# OPINION

### Facts

As stated, the facts surrounding the shooting are not disputed. However, the issue in this appeal is whether the jury erroneously rejected the insanity defense. Because a jury may in determining a defendant's sanity consider the facts surrounding the crime as well as the testimony of lay and expert witnesses, the proof offered at trial is summarized in detail hereafter.

On March 19, 1997, the defendant, twenty-five-year-old Christopher Flake, applied to purchase a Jennings .25 automatic pistol at Guns and Ammo in Memphis, Tennessee. He completed a form, providing background information that indicated he was not addicted to drugs or alcohol and had never been hospitalized or treated for mental illness. The application was processed; the retailer received the Sheriff's Department clearance for the defendant to purchase the gun; and on April 4, 1997, the defendant picked up the weapon. At this time, the defendant completed a second form, again indicating in response to specific questions that he had not used drugs or been committed to a mental institution.

The victim, Turner Carpenter, was a pastoral counselor at Central Church in Memphis, Tennessee. Carpenter was introduced to the defendant about six weeks prior to the shooting by the senior pastor of Central Church. At that time, Carpenter was told that the defendant was an alcoholic, who despite three years of sobriety, was unable to "get any peace." The defendant scheduled three individual counseling sessions with Carpenter, but the defendant, who was working and was enrolled in a criminal justice program at the University of Memphis, cancelled on each occasion because of scheduling conflicts. After the third cancellation, Carpenter recommended that the defendant participate in supervised group sessions at Central Church until his college and work schedule improved. The defendant agreed.

Carpenter next saw the defendant at approximately 6 p.m., on Sunday evening, April 6, 1997. Carpenter was meeting with a parishioner, Patricia Ann Hoffman, in his office at the church when the defendant "stuck his head in" the door and inquired if he could meet with Carpenter. When Carpenter responded that he would meet with the defendant in fifteen minutes, the defendant shook his head in disapproval but exited the office. Several minutes later, upon hearing a door open in the waiting area outside his office, Carpenter exited his office and saw the defendant in the waiting area.

After nodding to the defendant, Carpenter turned and walked back toward his office, intending to conclude his meeting with Hoffman. The defendant followed Carpenter down the hallway, however, yelling Carpenter's name and brandishing a gun. Obviously bewildered by the defendant's behavior, Carpenter asked, "Are you kidding?" The defendant responded that he was not kidding and shot Carpenter. The bullet struck Carpenter's outstretched hand, traveled between his index and ring fingers, through his arm, diaphragm, and liver, and lodged in his back, where it remained at the time of trial.

When he was shot, Carpenter fell to the floor, and in doing so, turned toward Hoffman, who was seated on a sofa not readily apparent from the defendant's position in the doorway. When Hoffman began to scream, the defendant turned toward her and held the gun to her head for some moments. The defendant did not shoot Hoffman, and after the defendant fled, Hoffman quickly summoned assistance, and Carpenter survived the shooting.

At trial, Carpenter characterized the shooting as "totally off the wall, weird, and crazy." Carpenter stated that there was no ill will between him and the defendant, and Carpenter could not provide a rational explanation for the defendant's behavior. Carpenter further testified that the defendant appeared normal and spoke in a soft voice when he first arrived at the church office. Just before the shooting, however, Carpenter described the defendant as "horrible looking," "crazed," like "the devil himself," yelling the victim's name in an "abnormal" voice.

Shortly after the shooting, Officer Robert Brandon Lampley was directed to the defendant's residence in Germantown to await the defendant's arrival. Officer Lampley parked so he could observe the defendant's driveway. About thirty to forty-five minutes later, a vehicle pulled into the driveway, and the defendant exited this vehicle. Officer Lampley and another officer walked up the driveway with guns drawn, and yelled, "Christopher." The defendant stopped, and a man, who Officer Lampley later learned was the defendant's father, walked out of the house and instructed the defendant to cooperate. After conducting a pat-down search, the officers handcuffed the defendant and placed him in the patrol car. Officer Lampley said the defendant showed no emotion when he was arrested.

A short time later Detective Johnny Brown verbally advised the defendant of his Miranda rights and asked the defendant if he knew why the officers were there. The defendant responded, "yes." When Detective Brown told the defendant he needed the weapon, the defendant advised that it was located in the vehicle's glove compartment. Detective Brown read a consent to search form to the defendant, and the defendant executed the form, which was witnessed by two officers. Detective Brown then opened the glove compartment and seized the pistol. Detective Brown said the defendant looked "tired" and 'kind of distraught," at this time, but he was otherwise behaving normally.

In support of the affirmative defense of insanity,[1] the defendant offered the testimony of several mental health professionals, including, Dr. Lynne Zager, Dr. Hilary Linder, Rebecca Smith, a psychiatric social worker, Dr. Rokeya Farooque, Dr. Sam Craddock, and Dr. John Hutson.

Dr. Lynne Zager is a clinical psychologist and Director of the Forensic Services Program at Midtown Mental Health Center, a private not-for-profit mental health center. Dr. Zager evaluated the defendant pursuant to a court order from October 17, 1997 to January 28, 1998, to determine his competency to stand trial and his mental state at the time of the shooting. Dr. Zager was certified as a forensic evaluator in 1983 and had conducted such evaluations since that time, often testifying as an expert witness, including a prior hearing to determine the defendant's competency to stand trial where she testified for the prosecution. In conducting the competency evaluations, Dr. Zager personally interviewed the defendant and reviewed the results of psychological tests previously administered. Dr. Zager opined that on April 6, 1997, the defendant suffered from paranoid schizophrenia, a severe mental disease or defect. She also opined that the defendant had been unable to appreciate the wrongfulness of his conduct in shooting Turner Carpenter. In forming these opinions, Dr. Zager relied in part upon Dr. Janet Johnson's medical records, [2] which indicated that Dr. Johnson saw the defendant twice during the week prior to the shooting, once for a regular appointment on April 1, 1997 and again on April 3, 1997, three days prior to the shooting, at the request of the defendant's father "because of [the defendant's] bizarre behavior." One example of the defendant's bizarre behavior described in Dr. Johnson's records was an incident where the defendant, upon seeing a man working outside on a farm, placed his prescription Prozac medication in the man's mailbox because he "felt that the man was in need of help." According to Dr. Zager, the defendant's mental problems were not apparent in a structured interview involving forms and questions about basic information. The problems became apparent, Dr. Zager explained, when the defendant was asked open-ended questions which allowed him to share his bizarre and false beliefs.

On cross-examination, Dr. Zager admitted that the defendant described the victim as "huggie, touchy" and suspected that the victim was homosexual.[3] Dr. Zager also acknowledged that the defendant's score on the Minnesota Multi-Phasic Personality Inventory - Second Edition ("MMPI-II") was indicative of malingering. Furthermore, according to Dr. Zager, the defendant first mentioned hearing voices, i.e., experiencing auditory hallucinations, after he was arrested for this crime. Despite a ten year history of mental health treatment preceding his arrest, the defendant had neither previously mentioned auditory hallucinations nor previously been diagnosed as schizophrenic. The defendant had been previously diagnosed with depression, mixed chemical dependency, oppositional disorder, which is characterized by resisting authority and refusing to

---

[1] The defendant was found incompetent to stand trial on several occasions. After receiving treatment, including anti-psychotic medication, the defendant was finally determined to be competent to stand trial in February of 1999, and his trial began November 15, 1999.

[2] Dr. Johnson was deceased at the time of trial.

[3] The proof indicated that the victim was not homosexual.

follow rules, and major affective disorder, which is characterized by severe mood problems rather than thought psychosis.

Testifying next for the defense was Dr. Hilary Linder, a psychiatrist employed since 1994 by the State of Tennessee at Western Mental Health Institute ("Western"). Dr. Linder began treating and evaluating the defendant in November of 1998, after the defendant had been declared incompetent to stand trial, with the goal of assisting the defendant attain competency to stand trial. To this end, Dr. Linder prescribed medication and counseling sessions. Dr. Linder testified as an expert witness on behalf of the prosecution at prior proceedings to determine the defendant's competency to stand trial, but he opined at trial that the defendant suffers from paranoid schizophrenia and has suffered from this severe mental illness since his early teen years. In addition, Dr. Linder opined that, on April 6, 1997, the defendant could not appreciate the wrongfulness of his actions in shooting the victim. Based on thirty-three years experience practicing psychiatry, Dr. Linder opined that the defendant was not malingering mental illness.

On cross-examination, Dr. Linder conceded that, despite ten years of prior mental health treatment, the defendant had not been diagnosed as schizophrenic prior to his arrest. Dr. Linder also acknowledged that prior to his arrest the defendant had not reported auditory hallucinations, a symptom critical to a diagnosis of schizophrenia. Had the defendant never reported auditory hallucinations, Dr. Linder conceded that the defendant most likely would have been diagnosed with anti-social personality disorder, a non-psychotic illness manifested by an inability to follow the law, which generally is not considered a severe mental disease or defect capable of supporting an insanity defense. Dr. Linder also acknowledged that the defendant's medical records reflect a history of polysubstance abuse, including alcohol, marijuana, inhalants, LSD, and amphetamines. Dr. Linder did not believe drug abuse was a factor in his evaluation since the defendant did not have access to drugs while incarcerated. Dr. Linder acknowledged, however, that the defendant tested positive for amphetamines upon his arrival at Western. Dr. Linder dismissed the result as a false positive even though no second test was performed to confirm this assumption. Dr. Linder confirmed that the defendant's records indicate three years of college course work in criminal justice and that, when he arrived at Western, the defendant said he planned to plead not guilty by reason of insanity and believed he would be released within sixty to ninety days if he obtained a verdict on this plea.

Also testifying for the defense was Rebecca Smith, a psychiatric social worker employed by the State of Tennessee at Middle Tennessee Mental Health Institute ("MTMHI"). Smith was responsible for researching and gathering the defendant's medical and personal history. The defendant told Smith that he was drunk for the first time at age twelve, that he was using inhalants three times per week by age fourteen, and had used LSD twice weekly since age eighteen. The defendant's mental health records indicated that he had often lied to family members about his drug and alcohol abuse. Smith testified that the defendant had not reported auditory hallucinations prior to his arrest for this crime, nor had he been diagnosed as schizophrenic. The defendant told Smith he originally met the victim while seeking help for alcohol dependency and became suspicious after the victim related his own history of alcohol dependency and criminal conduct. Because the victim was involved in a chemical dependency group at the church, the defendant believed the victim was

a terrorist with access to chemical weapons. The defendant explained that "voices" told him to shoot, but not kill, the victim, and that these same "voices" instructed him not to kill the woman who was meeting with the victim. According to the defendant, the shooting was intended to signal the Federal Bureau of Investigation to come to the church and take care of the terrorists and Mafia members associated with the church.

Dr. Rokeya Farooque, employed by the State of Tennessee as the attending psychiatrist in the forensic service program at MTMHI, also testified for the defense. Dr. Farooque evaluated the defendant from November 17 to December 16, 1997, to determine his competency to stand trial and his mental state at the time of the offense. As a result of this evaluation, Dr. Farooque concluded that the defendant was not competent to stand trial. Dr. Farooque explained that patients who are evaluated as a result of criminal charges are closely watched by all MTMHI staff because of the potential for malingering. Dr. Farooque concluded that the defendant was not malingering. After the trial court found the defendant incompetent to stand trial, Dr. Farooque treated him for nine or ten months before he was transferred to Western. As part of her evaluation and treatment, Dr. Farooque reviewed the defendant's medical records which indicated that he had experienced hallucinations associated with drug abuse, blackouts, major depression, an anxiety disorder, and an obsessive-compulsive disorder beginning around age twelve or thirteen and that he had received psychiatric treatment and hospitalization as a result of these conditions. Dr. Farooque diagnosed the defendant as paranoid schizophrenic and opined that the defendant was incapable of appreciating the wrongfulness of his conduct in shooting Turner Carpenter. While the defendant had not been diagnosed as schizophrenic prior to his arrest, Dr. Farooque explained that the prior diagnoses were completely consistent with undiagnosed schizophrenia. On cross-examination Dr. Farooque conceded that the defendant did not report auditory hallucinations until after his arrest and that this report was crucial to her diagnosis of schizophrenia. Dr. Farooque also admitted that no means are available to objectively verify that the defendant actually experiences the symptoms he reports, including auditory hallucinations.

Also testifying for the defense was Dr. Samuel Craddock, a clinical psychologist employed by the state at MTMHI to conduct forensic evaluations. Dr. Craddock has appeared in court as an expert witness once or twice per month since 1976, and previously testified for the prosecution in a prior hearing to determine the defendant's competency to stand trial. Dr. Craddock examined the defendant in November and December of 1997, pursuant to a court order, and during this time, administered a battery of tests to assess the defendant's intelligence, personality, reasoning, judgment, visual, and processing skills. While conceding that some of these test scores indicated malingering, Dr. Craddock explained that the scores are not conclusive and may also indicate severe mental illness. Based upon his clinical evaluation, Dr. Craddock opined that the defendant was not malingering. Dr. Craddock diagnosed the defendant with paranoid schizophrenia and said the defendant was suffering from this severe mental disease or defect at the time of the shooting. Dr. Craddock also opined "with qualifications" that the defendant could not appreciate the wrongfulness of his actions. While the defendant understood that shooting a person is wrong and can result in an arrest, Dr. Craddock explained that the defendant "morally felt justified" in shooting the victim because the defendant believed the victim was a terrorist and that eliminating such a terrorist would

morally benefit society. On cross-examination, Dr. Craddock admitted that the defendant is quick to believe he is being treated inequitably and will hold a grudge against others even if the perceived wrong is unintentional. Dr. Craddock also acknowledged that the defendant had not mentioned experiencing auditory hallucinations prior to his arrest in this case and that despite many years of mental health treatment, the defendant had not been diagnosed as schizophrenic prior to his arrest.

The defendant's final expert witness was Dr. John Hutson, a clinical psychologist who was hired by the defendant's family and who met with the defendant in the Shelby County Jail on April 8, 1997, two days after the shooting. Dr. Hutson said he initially was struck by the defendant's "impeccable," "male model" appearance, which Dr. Hutson described as not typical of incarcerated, mentally ill individuals. Nevertheless, Dr. Hutson said the defendant had a flat affect, complained of auditory hallucinations, and was reluctant to speak with him because of instructions from defense counsel to remain silent. The defendant freely spoke with Dr. Hutson only after his attorney instructed him to do so, but according to Dr. Hutson, the defendant was not on the same "logic line" as the interview questions. Dr. Hutson reviewed the records of the defendant's ten year history of psychiatric treatment, including in-patient treatment, and talked with some of the defendant's treating psychologists and psychiatrists. Dr. Hutson also administered several tests including the MMPI-II. According to Dr. Hutson, the results of this test indicated that the defendant was "floridly psychotic." Dr. Hutson, who had evaluated over 10,000 individuals, described the defendant as "one of [the] three most disturbed individuals I've ever seen in my career," and opined that the defendant was not malingering. Dr. Hutson stated that the defendant suffers from schizophrenia, undifferentiated-disorganized type, "a very serious incapacitating psychiatric illness." Over the course of his career, Dr. Hutson had opined in only twenty-five cases that the patient could not appreciate the wrongfulness of his or her conduct, but he stated that the defendant falls squarely within that narrow category of patients. According to Dr. Hutson, the defendant believed he was working for the government as an agent or an enforcer when he shot the victim.

On cross-examination, Dr. Hutson admitted that the defendant exhibited a preoccupation with homosexuality. The defendant believed the victim was very effeminate and hated the victim for the way he touched him. The defendant was so overly sensitive to homosexuality that Dr. Hutson thought "it might have had fatal consequences if somebody physically touched him." Dr. Hutson also was questioned about the defendant's activities during the day prior to the shooting. Based on notes apparently taken during an interview with the defendant's father, Dr. Hutson said the defendant awoke about 9:00 a.m., was in a good mood, helped his father cook breakfast, worked on his car with his father, rode his trail bike, walked his dog in the park, watched a movie about a criminal trial, chose a television movie to watch that evening with his parents, helped cook dinner on an outdoor grill, ate dinner, and then left for a meeting at Central Church about 5:40 p.m., assuring his parents that he would return right after the meeting so they could watch the movie together as planned. Like the other defense experts, Dr. Hutson admitted that the defendant reported auditory hallucinations for the first time on the day after his arrest and acknowledged that this report was not spontaneous but was in response to questioning by the defendant's mother about whether he had ever heard voices. Dr. Hutson also conceded that if the defendant had not reported auditory hallucinations his

diagnosis would not have been schizophrenia and instead probably would have been borderline, antisocial, or schizoid personality disorder.[4]

In rebuttal, the prosecution offered three witnesses. Dr. John McIntosh, a psychiatrist employed by Shelby County to render psychiatric care to inmates, testified that he had conferred with the defendant for approximately one hour on May 9, 1997, at the Shelby County Jail. At that time, Dr. McIntosh found no evidence to suggest that the defendant suffered from psychosis but concluded instead that the defendant was suffering from depression and attention deficit disorder. The defendant did not report auditory hallucinations. Dr. McIntosh acknowledged that his examination was not designed to determine the defendant's competency to stand trial or his mental state at the time the offense was committed and conceded that mental health professionals who observed the defendant for a thirty-day period were in a better position to perform a comprehensive evaluation and render an opinion. Dr. McIntosh acknowledged that he did not review the defendant's prior psychiatric medical records. While agreeing with the defense experts that the defendant has a "serious mental disease," Dr. McIntosh disagreed with the diagnosis of schizophrenia. Dr. McIntosh was not asked to opine whether or not the defendant was able to appreciate the wrongfulness of his conduct in shooting the victim.

Also testifying for the prosecution was Dr. Mark Luttrell, a physician who provided medical services at the Shelby County Jail. Dr. Luttrell treated the defendant in July of 1997, for a urinary tract infection and noticed no apparent mental distress or signs of schizophrenia on that occasion. Dr. Luttrell described the defendant as "unremarkable, . . . just like everybody else." Although he did not conduct a mental evaluation of the defendant, Dr. Luttrell, who had completed a residency in psychiatry, agreed with Dr. McIntosh's diagnosis that the defendant suffered from a serious mental disorder. Dr. Luttrell was not asked to opine whether or not the defendant could appreciate the wrongfulness of his conduct in shooting the victim.

The prosecution's final rebuttal witness was John Perry, director of mental health for the Shelby County Jail. Perry saw the defendant when he first arrived at the jail and four or five days per week thereafter while he was incarcerated. According to Perry, the defendant did not "sit and stare" during that time as he was doing during the trial.

At the conclusion of this proof, the jury was instructed on the offense of attempted first degree murder and the lesser offenses of attempted second degree murder, attempted voluntary manslaughter, and aggravated assault. The jury also was instructed on the insanity defense. The jury returned a verdict finding the defendant guilty of attempted voluntary manslaughter, thereby implicitly rejecting the insanity defense. The trial court entered a judgment in accordance with the jury's verdict, and explicitly refused to set aside the verdict as the thirteenth juror. The defendant appealed, arguing in the Court of Criminal Appeals that he had met his burden of establishing the

---

[4]According to the testimony of Dr. Zager, schizoid personality disorder is not schizophrenia and persons with schizoid personality disorder tend to stay to themselves, have few social relationships, and manifest odd or unusual behavior.

insanity defense by clear and convincing evidence and that the jury had erred in rejecting the defense. The intermediate appellate court agreed, concluding that "a rational trier of fact could only find that there is no serious or substantial doubt that the defendant, at the time of the shooting, was unable to appreciate the wrongfulness of his act as a result of a severe mental disease." In so holding, the Court of Criminal Appeals stated, "our review of this record does not reveal sufficient lay testimony, or expert testimony, concerning the defendant's mental state at or near the time of the shooting that would justify rejection of the insanity defense." Accordingly, the Court of Criminal Appeals modified the judgment to not guilty by reason of insanity and remanded the case to the trial court for further proceedings pursuant to Tenn. Code Ann. § 33-7-303.

Thereafter, the State filed an application for permission to appeal, arguing that the Court of Criminal Appeals had erred both in reversing the jury's verdict and by imposing upon the State a burden to offer proof to rebut the insanity defense when the statute describing the defense, Tenn. Code Ann. § 39-11-501, does not impose any burden upon the State. We granted the State's application to determine whether the burden of proof on the insanity defense affects the standard of appellate review of a jury's finding on insanity. We unanimously conclude that the proper standard of review in light of the statute requiring the defendant to prove insanity by clear and convincing evidence is whether, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. This essentially is the standard of review adopted by the Court of Criminal Appeals in this case; however, for the reasons that follow, a majority of this Court concludes that the Court of Criminal Appeals did not afford appropriate deference to the jury's verdict when applying this standard.[5] Accordingly, the judgment of the Court of Criminal Appeals is reversed and the judgment of the trial court is reinstated.

## Insanity Defense

Until 1995, the standard for sustaining an insanity defense was as follows:

Insanity. –(a) Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law.

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Tenn. Code Ann. § 39-11-501(repealed 1995); see also Graham v. State, 547 S.W.2d 531 (Tenn. 1977). Under this standard, a defendant was presumed sane, but if the evidence introduced during the course of the trial raised a reasonable doubt as to the defendant's sanity, the State then had the burden of proving the defendant's sanity beyond a reasonable doubt. Graham, 547 S.W.2d at 544; see also State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994); Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976). Sanity became an element of

---

[5] Justice Anderson and Justice Birch concur in the adoption of this standard of review but disagree with the majority's application of this standard to the facts and circumstances of this case.

the crime.  Sparks, 891 S.W.2d at 616; Jackson, 890 S.W.2d at 440; State v. Clayton, 656 S.W.2d 344, 346 (Tenn. 1983).

The General Assembly adopted a statutory amendment, effective July 1, 1995, which substantially revised the insanity defense.  Currently, the insanity defense is as follows:

> Insanity. (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts.  Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a).  Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501 (1997 Repl.).  Passage of this statute resulted in three principal changes to the insanity defense.[6]  First, the definition of insanity has been narrowed so that the defense now applies only when the defendant has a severe mental disease or defect which results in the defendant's being "unable to appreciate the nature or wrongfulness of such defendant's acts."[7] Second, insanity is an affirmative defense.  The prosecution no longer has the burden of proving sanity beyond a reasonable doubt.  Instead, the defendant bears the burden of establishing the defense by clear and convincing evidence.  "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Holder, 15 S.W.3d at 911(quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)).  Third, under the current statute, both prosecution and defense experts are prohibited from offering opinion testimony as to whether or not the defendant was sane at the time the offense was committed.  See, e.g., State v. Perry, 13 S.W.3d 724 , 739-42 (Tenn. Crim. App.), perm. app denied (Tenn. 1999); see also Advisory Commission Comments to Tenn. R. Evid. 704 (explaining that insanity is one ultimate issue outside the scope of expert testimony).  The ultimate issue of the

---

[6]This statute was patterned upon and is very similar to the Federal Insanity Defense Reform Act of 1984 codified at 18 U.S.C. § 17. See State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999), perm. app. denied (Tenn. 2000).  The changes to the insanity defense in federal courts resulting from the Insanity Defense Refrom Act of 1984 are described by the Court of Appeals for the Eleventh Circuit in United States v. Freeman, 804 F.2d 1574 (11th Cir. 1986).

[7]The 1995 amendment eliminated  the volitional prong of the insanity defense i.e., "lacked the capacity to conform that conduct to the requirements of the law."

-10-

defendant's sanity is "a matter for the trier of fact alone."  Tenn. Code Ann. § 39-11-501(c) (1997 Repl.).

Admittedly, the 1995 statute does not by its terms alter the standard of appellate review of a jury's finding on the insanity defense.  Nevertheless, the defense has been fundamentally altered by the statute, and the standard of review must be revised to account for these modifications.  Sanity is no longer an element of the offense.  The sufficiency of the evidence standard previously applied by appellate courts reviewing a jury finding on sanity – whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt[8] – is no longer appropriate.   This Court has not previously addressed the current insanity defense or its effect on the standard of appellate review.

In this Court, the State relies upon United States v. Barton, 992 F.2d 66, 68-69 (5th Cir. 1993), and argues that an appellate court should view the evidence in the light most favorable to the prosecution and reverse a jury verdict rejecting an insanity defense "only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence." Id.  According to the State, such a standard permits reversal on appeal only when the jury's rejection of the insanity defense is contrary to the evidence as a matter of law.  The State says that the Court of Criminal Appeals essentially adopted this standard but erred in applying it by substituting its judgment for that of the jury and by imposing a burden of proof on the State not mandated or contemplated by the statute.  In support of this second assertion, the State  points to the following sentence in the decision of the Court of Criminal Appeals: "The testimony of state witnesses Dr. John McIntosh, Dr. Mark Luttrell, and John Perry did not create an issue for the jury."  The defendant responds that the Court of Criminal Appeals adopted and properly applied the governing  standard of review.  According to the defense, the sentence to which the State objects indicates that the intermediate appellate court properly considered whether the prosecution had offered substantial evidence to counter the defense proof of insanity and create a jury question on the issue.

Our research indicates that appellate courts in other jurisdictions apply a deferential standard when reviewing a jury's rejection of the insanity defense, but appellate courts do not use uniform language when describing the applicable standard.  The "reasonableness" standard adopted by the Fifth Circuit Court of Appeals in Barton has been adopted by some state courts considering the issue. See Fuss v. State, 519 S.E.2d 446, 448 (Ga. 1999)("whether after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the crime."); State v.  Silman, 663 So.2d 27, 32 (La. 1995); State v. Prince, 688 So.2d 643, 649 (La. Ct. App. 1997) ("whether, viewing the evidence in the light most favorable to the state, any rational juror could have found that the defendant had not proven by a preponderance of the evidence that he was insane at the time of the offense.").  Other state appellate courts preclude disturbing the fact-finder's resolution of the

---

[8]See Jackson v. Virginia, 443 U. S. 307, 99 S. Ct.  2781,  61 L. Ed.2d 560 (1979); Jackson, 890 S.W.2d at 441.

sanity issue "unless the verdict is contrary to the manifest weight of the evidence,"[9] or "the proof of insanity is overwhelming"[10] or the verdict is "contrary to the great preponderance of the evidence,"[11] or the "judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust."[12]  Arkansas appellate courts review a jury verdict rejecting the insanity defense to determine "whether there was any substantial evidence to support the verdict."[13]  The Indiana Supreme Court has stated that a defendant whose insanity defense fails at trial "has a monumental burden if he seeks to upset the finding of the fact trier on appeal, for he is appealing from a negative finding, and the issue is not whether or not the finding was sustained by the evidence but rather whether it was contrary to all the evidence and hence contrary to law."  Turner v. State, 428 N.E.2d 1244, 1246 (Ind. 1981) (emphasis in original).  Indiana appellate courts, therefore, reverse a fact finder's rejection of the insanity defense "only when the evidence is without conflict and leads to but one conclusion which the trier of fact did not reach."[14]

This lack of uniformity on the proper standard of appellate review is also reflected in federal appellate court decisions, which we view as particularly relevant to the issue in this appeal since, as noted, the federal insanity statute is the model upon which our current statute is based.  Some federal circuit courts apply a "clearly erroneous" standard of review, reversing a jury's finding on the insanity issue only if it is clearly erroneous.  See United States v. Hiebert, 30 F.3d 1005, 1007 (8th Cir. 1994); United States v. Reed, 997 F.2d 332, 334 (7th Cir. 1993); United States v. Freeman, 804 F.2d 1574, 1577 (11th Cir. 1986).  Other federal courts, including the Fifth Circuit, apply the "reasonableness" standard, derived from the Jackson v. Virginia, sufficiency standard.  Barton, 992 F.2d at 69; United States v. Martin, 56 M.J. 97, 106 (C.A.A.F. 2001).  This "reasonableness" standard requires an appellate court to view the evidence in the light most favorable to the prosecution and reverse a jury verdict rejecting the insanity defense "only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence."  Barton, 992 F.2d at 69; Martin, 56 M.J. at 107.  Like the various other standards applied in both state and federal courts, the reasonableness standard is deferential in nature, as the Fifth Circuit aptly explained as follows:

---

[9] People v. Johnson, 585 N.E.2d 78, 86 (Ill. 1991).

[10] Christian v. State, 351 So.2d 623, 624 (Ala. 1977).

[11] Alvis v. Alabama, 434 So.2d 859, 862 (Ala. Ct. Crim. App 1983).

[12] Meraz v. State, 785 S.W.2d 146, 155 (Tex. Ct. Crim. App. 1990); Jackson v. State, 941 S.W.2d 351, 352 (Tex. Ct. App. , 13th Dist. Corpus Christi 1997); Morgan v. State, 869 S.W.2d 388, 389 (Tex. Ct. App. 12th Dist. Tyler 1993); see also People v. Sangalang, 2001 Guam 18, 2001 WL 950161, *8  (Guam  2001).

[13] Haynes v. State, 58 S.W.3d 336, 341 (Ark. 2001); Phillips v. State, 863 S.W.2d 309, 311 (Ark. 1993).

[14] Gambill v. State, 675 N.E.2d 668, 673 (Ind. 1996); see also Hurst v. State, 699 N.E.2d 651, 654 n.3 (Ind. 1998).

It is not sufficient here that Barton's evidence might appear to us, were we the finder of fact, to be clear and convincing. We are not fact finders and do not assess the credibility of the testimony or the weight of the evidence. These are the jury's responsibilities. This deference is particularly appropriate where the jury has found against a party having the burden of proof by clear and convincing evidence. As the D.C. Circuit said, "when insanity is raised as a defense to crime, a judgment of acquittal by reason thereof, we have emphasized, should be granted only in exceptional cases. And in view of the complicated nature of the decision to be made – intertwining moral, legal, and medical judgments – it will require an unusually strong showing to induce us to reverse a conviction because the judge left the critical issue of criminal responsibility with the jury. We think it clear in this case that the trial judge left it where it belonged."

Barton, 992 F.2d at 70 (quoting Gaskins v. United States, 410 F.2d 987, 990-91 (D.C. Cir. 1967)) (internal citations omitted). In so holding, the court rejected Barton's assertion that the government is required to counter the defendant's proof by offering rebuttal evidence or contrary expert testimony. Barton, 992 F.2d at 70. The court further pointed out that the prosecution can counter defense proof of insanity by presenting the testimony of lay witnesses and by undermining the defense expert's credibility through cross-examination. Id.

The United States Court of Appeals for the Armed Forces recently adopted the Fifth Circuit approach and, in a comprehensive and thorough opinion, explained the rationale underlying its decision:

Such a test of reasonableness is consistent with congressional intent that determinations of mental responsibility are for the trier of fact to make alone, and not experts offering ultimate opinions. It also recognizes that the trier of fact is better positioned than are appellate courts to appraise and weigh the evidence and apply the appropriate burden of proof to the party that bears the burden. This may be particularly true of an insanity defense, such as that presented in this case, where there are multiple competitive experts, complex facts, and numerous witnesses testifying to the accused's demeanor at the time of the offense.

A reasonableness standard is also appropriate because appellate courts have only a jury's conclusion, implicit in an ultimate finding of guilt, against which to test for error. In contrast, where a trial judge makes a finding of fact on mental responsibility, an appellate court tests for clear error - against the judge's specific findings of fact, included in the record, underpinning his or her conclusion. Finally, the reasonableness standard is consistent with our preference for, and deference afforded to, juries in our constitutional system of justice.

Martin, 56 M.J. at 107.

-13-

After considering these various standards, we unanimously conclude that appellate courts in Tennessee should apply the reasonableness standard when reviewing a jury's rejection of the insanity defense. Consistent with the expressed legislative intent of Tenn. Code Ann. § 39-11-501(c) and other Tennessee standards governing appellate review of factual findings,[15] this standard is properly deferential to the finding of the trier of fact. On the other hand, this standard does not totally insulate the jury's finding from appellate review; rather, it enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying. Accordingly, appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. Although phrased differently, this essentially is the standard applied by the Court of Criminal Appeals in this case. In so holding, we explicitly reject the notion that the State must rebut defense proof of insanity with substantial evidence. The current statute clearly does not impose such a burden of proof on the prosecution. The statute places the burden of establishing this affirmative defense squarely on the defendant. Once this defense has been interposed, the prosecution likely will in most cases attempt in some manner to counter the defense proof. As noted by the Fifth Circuit, however, defense proof can be countered by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense experts. A reviewing court applying the reasonableness standard should consider all the evidence in the record in the light most favorable to the state in determining whether the jury appropriately rejected the insanity defense.

Appellate courts also should be mindful of several other well-settled propositions that were not affected by the 1995 statutory revision of the insanity defense. For example, in determining the defendant's mental status at the time of the alleged crime, the trier of fact may consider evidence of his actions and words at or near the time of the offense. Sparks, 891 S.W.2d at 616. The trier of fact may also consider both lay and expert testimony. Sparks, 891 S.W.2d at 616; Jackson, 890 S.W.2d at 440; Edwards, 540 S.W.2d at 647. The weight and value to be given expert testimony is a question for the jury. Id. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Id. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations. Holder, 15 S.W.3d at 912.

Considering the evidence in this record in the light most favorable to the prosecution, a majority of this Court concludes that a reasonable trier of fact could have found the defendant failed to show by clear and convincing evidence that as a result of a severe mental illness or defect he was

---

[15] See, e.g., Tenn. R. App. P. 36(a)("The Supreme Court, Court of Appeals, and Court of Criminal Appeals shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief, including the giving of any judgment and making of any order; provided, however, relief may not be granted in contravention of the province of the trier of fact.")(emphasis added).

unable to appreciate the wrongfulness of his acts. First, the record contains evidence suggesting the defendant was not suffering from a severe mental illness at the time of the offense. As much as two weeks and as little as two days prior to this shooting, the defendant had the presence of mind to falsely answer questions regarding prior mental health treatment and drug abuse which, had he answered truthfully, probably would have prevented him from obtaining the weapon used to commit this crime. In addition, the proof showed that, while the defendant behaved strangely during the week preceding the shooting, his behavior on the day of the shooting had been perfectly normal. As stated by Dr. Hutson, the defendant awoke about 9:00 a.m., was in a good mood, helped his father cook breakfast, worked on his car with his father, rode his trail bike, walked his dog in the park, watched a movie about a criminal trial, chose a television movie to watch that evening with his parents, helped cook dinner on an outdoor grill, ate dinner, and then left for a meeting at Central Church about 5:40 p.m., assuring his parents he would return immediately after the meeting to watch the movie together as planned. While the shooting itself was certainly unexpected, there is proof in the record to suggest an explanation, albeit far-fetched, for the shooting. The testimony indicated that the defendant was preoccupied with homosexuality, that he believed the victim was very effeminate, that he suspected the victim was homosexual, and that he hated the victim for the way he touched him. Dr. Hutson testified that, given his preoccupation with homosexuality, physically touching the defendant could have fatal consequences. This proof suggests a motive for the shooting, and the jury's verdict of attempted voluntary manslaughter indicates that perhaps this motive was credited.

Second, defense proof that the defendant suffered from a severe mental illness was countered by testimony elicited on cross-examination of the defense experts suggesting the defendant was malingering. Although all the mental health experts opined that the defendant suffers from schizophrenia, the proof is clear that, throughout ten years of prior mental health treatment, the defendant had not been diagnosed as schizophrenic and had never complained of auditory hallucinations. In fact, the defendant's report of auditory hallucinations following his arrest was not spontaneous but was in response to a question from his mother. The experts admitted that the defendant's report of auditory hallucinations was a critical factor in the diagnosis of schizophrenia, and they conceded that there are no existing objective tests to verify that the defendant actually suffers from auditory hallucinations. Results of two psychological tests indicated that the defendant was malingering mental illness, but the expert witnesses discounted these results. Two of the experts testified that had the defendant not reported auditory hallucinations, he likely would have been diagnosed as suffering from various personality disorders, which generally are not considered to be severe mental conditions capable of supporting an insanity defense. The proof also showed that, before his arrest, the defendant had attended the University of Memphis for three years studying criminal justice and that on the day of his admission to Western, he had advised Dr. Linder that he intended to plead not guilty by reason of insanity and believed he would be released within sixty to ninety days if he received a verdict on that plea. According to psychological records of the defendant's mental health treatment prior to his arrest, he had a history of polysubstance abuse and had often lied to his parents about the extent to which he abused drugs and alcohol. Although the experts testified that the defendant's history of substance abuse had no impact on their evaluations since he had been incarcerated and had no access to drugs, Dr. Linder admitted that the defendant

tested positive for amphetamines when he arrived at Western, even though he had no prescription for amphetamines. Dr. Linder assumed the result was a false positive but admitted that he did not re-test to confirm this assumption.

Finally, notwithstanding expert proof to the contrary, the facts surrounding the offense suggest the defendant realized his conduct was wrongful. With the exception of Dr. Craddock, the mental health professionals testified that the defendant was unable to appreciate the wrongfulness of his conduct in shooting the victim. Dr. Craddock opined that the defendant was aware that shooting someone was wrongful, but he felt morally justified in shooting the victim whom he believed to be a terrorist. The facts show, however, that the defendant did not shoot the parishioner with whom the victim was meeting, and he fled the scene, rather than waiting for the arrival of the FBI. At the time of his arrest, the defendant appeared to realize he had committed a crime. When asked if he knew why the officers were at his house he responded "yes" and told the officers that the weapon was in the glove compartment. Although the officers said the defendant showed little emotion and appeared "distraught" or "tired," they observed no bizarre behavior. After his arrest, the defendant complied with his attorney's instruction not to speak with anyone alone, as is evidenced by Dr. Hutson's testimony that the defendant was reluctant to speak with him until receiving permission from his attorney. Dr. McIntosh, Dr. Luttrell and John Perry said the defendant behaved normally while incarcerated although he did appear depressed.

After reviewing the evidence in the light most favorable to the State, a majority of this Court is unable to conclude that no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence. Where the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review. As noted by the Fifth Circuit Court of Appeals, appellate courts are not fact finders, and reversal is not appropriate where the evidence might appear to us clear and convincing were we fact finders. Appellate courts do not reweigh the evidence or reassess credibility determinations. These tasks are within the province of the jury. While the proof in this record indicates that the defendant suffers from a mental disorder, such proof does not mandate a jury finding that a defendant is legally insane. Cf. Coe v. State, 17 S.W.3d 193, 221 (Tenn. 2000) ("[T]he existence of a mental disorder does not automatically translate into a finding of incompetency to be executed."); Reed, 997 F.2d at 334 ("Insanity, for our purposes, is a legal term. We do not ask whether Reed is insane by psychiatric or psychological standards."). In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony. While a jury may not arbitrarily ignore evidence, a jury is not bound to accept the testimony of experts where the evidence is contested. Indeed, this principle is explicitly reflected in the current statute which prohibits experts from testifying on the ultimate issue of the defendant's sanity and reserves this issue for the trier of fact alone. There is nothing in this record to suggest that the jury arbitrarily ignored the expert testimony. The record reflects that the jury deliberated seventy-one minutes, then

posed three questions two of which appear related to the insanity defense.[16] Moreover, the trial judge in this case was specifically asked by defense counsel to exercise his role as thirteenth juror and enter a judgment of not guilty by reason of insanity. The trial court declined, stating, "the defense of insanity was appropriately litigated and I think that the jury appropriately made the proper determination."

### Conclusion

Reviewing this record in the light most favorable to the State, a majority of this Court concludes that the Court of Criminal Appeals erred in reversing the jury's verdict. Accordingly, the judgment of the Court of Criminal Appeals modifying the verdict to "Not Guilty By Reason of Insanity" is reversed and the judgment of the trial court is reinstated.

_____
FRANK F. DROWOTA, III,
CHIEF JUSTICE

---

[16]The jury inquired: "(1) Where was the second bullet casing found? (2) Was the defendant on medication at the time of the crime? and (3) Did Chris Flake say anything to Turner Carpenter at the time of the act besides, Turner, Turner Carpenter?"