IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 10, 2002

## STATE OF TENNESSEE v. GLEN CHANDLER

**Direct Appeal from the Circuit Court for Hickman County**
**No. 00-5014CR-II    Timothy L. Easter, Judge**

---

**No. M2002-00207-CCA-R3-CD - Filed September 12, 2003**

---

The appellant, Glen Chandler, was convicted in a jury trial of the offenses of attempted first degree murder, attempted second degree murder, attempted voluntary manslaughter, and reckless endangerment. He was sentenced to an effective thirty-eight-years, eleven months and twenty-nine days sentence. In this appeal the appellant maintains the State failed to carry its burden of proof on the question of the appellant's sanity. He also argues that the trial court erred in failing to set aside the guilty verdict of attempted first degree murder because the proof established that the appellant was incapable of premeditation.

After a review of the record and the applicable authorities we conclude that the State is not under any burden of proof with respect to the question of sanity in a criminal prosecution. We further find that the appellant has failed to establish that considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the appellant's insanity at the time of the offense was established by clear and convincing evidence. Finally, there is ample proof in the record from which any rational trier of fact could conclude that the appellant premeditated his attempt to kill Detective James Bentley. Thus, the evidence is sufficient to support the verdict of attempted first degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

F. Shayne Brasfield, Franklin, Tennessee, for the appellant, Glen Chandler.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; Ron Davis, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Background

On November 14, 1999, Lewis County Sheriff DeWayne Kilpatrick notified the Hickman County authorities that the Lewis County authorities had an incident with the appellant and that the appellant may be heading toward Hickman County and was possibly armed and dangerous. On that same date Detective Larry Holman, Jr., of the Hickman County Sheriff's office was notified that officers were going to the residence of the appellant's nephew, Jeff Chandler. When Detective Holman and the other Hickman County officers arrived in the vicinity of the residence, they encountered Kenneth and Lehman Chandler, the appellant's brothers. The brothers requested five minutes to try to talk the appellant into coming out of the woods where he was hiding.

The officers agreed to wait, and after approximately five minutes proceeded to drive to the residence. Once they exited their cars they heard the appellant yelling in the woods. Since Detective Holman had been apprised of the situation in Lewis County, the Hickman County officers discussed how best to handle the appellant. Because Kenneth Chandler was afraid that the appellant would harm his son, Jeff, he insisted that the officers not wait any longer in trying to get his son out of the residence.

Chief Deputy James "Hootie" Bentley and Deputy Daryl Grove of the Hickman County Sheriff's office drove up the hill toward the residence while announcing their presence over the police car's public address system. A few minutes later, Deputy Bentley radioed Detective Holman and Deputy Brandy Sullivan to begin walking up the hill to the woods behind Jeff Chandler's house. The officers could hear the appellant yelling something like "it's a good night for a pig killing."

Detective Holman and Deputy Sullivan approached the woods from different angles. Detective Holman approached the area in front of the woods, which was illuminated by a security light, where he saw an old freezer and started to investigate when he heard a sound behind him. When he turned he saw a muzzle flash and heard the blast of a weapon being fired. He retreated back and then fell to the ground, having been shot in the legs. He stated that the appellant, challenging the police to come get him, continued yelling "Come on pigs, come on."

At this point the other officers in the area began to return fire. Detective Holman saw that the appellant continued to fire on the officers. He crawled over to the squad car and discovered that Chief Deputy Bentley had also been shot. Detective Holman then heard over the car's radio that permission had been given to shoot out the security light in an effort to hide the officers from the appellant. Detective Holman stated that at one point he heard the appellant approaching his position but that the appellant subsequently turned and left. It was more than an hour and a half after the incident began that the other officers arrived and the wounded deputies were transported to the

hospital, during which time the appellant continued to periodically direct shots towards police officers. Eventually approximately one hundred police officers converged on the scene before the appellant emerged from the woods with his arms outstretched as he walked toward the officers. Detective Holman was hospitalized for a week and underwent extensive therapy to enable him to walk again. Chief Deputy Bentley spent a total of fifty-two days in the hospital after discovering that he had been shot with a double-ought buckshot, and that six pellets, each as big as a .22 round, had hit him.

Agent Robert Schlafly of the Tennessee Bureau of Investigation interviewed the appellant after his arrest. The appellant initially denied any knowledge of what had happened. He stated that he was distraught because his wife and daughter had left him and that he was disabled and unable to work. He stated that he was on the hill that night when he heard police yelling for someone to open the gate. He started down the hill but someone jumped out from behind a bush and hit him in the head. He stated that he woke up the next morning on the side of the road and did not know how he got there. In addition, he said that his wife and others were involved in a drug ring, and that on the night in question, he had been attacked by these people. The appellant was asked if he was on any type of medication, and he responded that he would "take the Fifth," but later stated he took two Tylenol that day and had in the past taken Lortab 5 for pain. He did acknowledge owning a twelve-gauge shotgun and a fifty-caliber muzzle loader, but did not know where the weapons were.

The appellant was informed that the officers who had been shot had lived and could identify him as their shooter. At this point he admitted his involvement in the shooting, but contended that he was only aware that "some people" had driven up the hill and started the shooting and that he, in turn, shot back in self-defense. He stated that he spent the rest of the night running around the hill, hoping to be shot.

The appellant stated that when he saw the SWAT team coming up the hill, he decided to give himself up to avoid any further trouble and to avoid getting hurt. He informed the TBI where the shotgun that he used in the shootings could be found and willingly gave a blood sample, which tested negative for drugs.

Another of the appellant's brothers, Clay Chandler, testified that the appellant's personality changed when he was sixteen. The appellant was in a serious car accident that required extended use of pain medication. The appellant also had marriage problems around 1972 and was admitted to Middle Tennessee Mental Health Institute. Clay also stated that sometime in the 1980's the appellant again had marriage problems and was admitted to the Middle Tennessee Mental Health Institute. He also testified that even though the appellant had marital problems, he had remained married to the same woman for twenty years.

In the weeks prior to the shooting, Clay notified the sheriff that the appellant was acting oddly. He had been making his bed to look like he was sleeping in it and then sleeping in the woods with his guns. Clay was concerned that the appellant might hurt himself or someone else.

Lehman Chandler stated that in the days prior to the shooting, the appellant appeared to be mixed up and was not making any sense. On the night of the shooting, Lehman tried to lure the appellant out of the woods by telling the appellant that he had a new coon dog. However, on cross-examination, Lehman stated that he was not afraid of his brother and did not consider him a threat. Lehman also testified that he had not talked to the appellant on the day in question and could not say what his state of mind was on that day.

Hickman County Sheriff Frank Atkinson testified that he had known the appellant since 1960. Sheriff Atkinson testified that about a week before the shooting, both Clay and Lehman Chandler came to see him to relate an incident where the appellant had been asked to leave their lake because he was armed. Both Chandlers were concerned about the appellant's state of mind. On the day of the shooting, Sheriff Atkinson contacted Chief Deputy Bentley to share those concerns.

The appellant's sister, Jane Gilbert, testified that in the weeks prior to the shooting, the appellant's wife had left him. Gilbert stated that the appellant usually had problems when he was experiencing marital discord, but that he was a good father and seemed responsible. In the week preceding the shooting, the appellant called Gilbert several times telling her that he missed his wife and daughter. On Thursday, prior to the shooting on Sunday, the appellant left several nonsensical messages on Gilbert's answering machine.

Jeff Simerly, a friend of the appellant, said that he spoke with the appellant on a daily basis since his wife left him. Simerly also noted that he had several nonsensical conversations with the appellant, including one in which the appellant alleged that he had been raped with a broom handle by drug dealers and that his estranged wife was involved in a cocaine ring.

Jeff Chandler, the appellant's nephew, testified that on the night of the shooting, the appellant came to his home shortly after 8:00 p.m. The appellant told Jeff that he had been in a fight in Hohenwald and needed to clean up. Jeff asked the appellant if he was then going home, and the appellant stated that he was going to sleep on the ridge, meaning outside. Jeff testified that at that time the appellant seemed okay and calm. The appellant left about an hour later. Around 10:00 p.m., Jeff was awakened by the sound of a car at his home. He looked out the window and saw the appellant at the bottom of the driveway sneaking up the hill carrying a gun. At this point, Jeff notified Kenneth, his father, to apprise him of the situation.

Dr. Keith Caruso testified that the appellant suffered from schizoaffective disorder, bipolar type. He stated that such a condition was episodic, meaning that the appellant could be fine at times but suffer depressive or manic episodes at other times. He also noted that the appellant was susceptible to episodes when his personal relationships were in trouble. Dr. Caruso opined that the appellant's condition would result in delusions causing the appellant to believe that his wife was involved in the drug trade and that there was a conspiracy to kill him. Dr. Caruso noted that the appellant had back problems and had been prescribed an antidepressant and another drug called Depakote for the condition. He stated that Depakote is also used to treat bipolar disorder and when the appellant's wife left, he discontinued taking his medication, which resulted in the shooting. Dr.

Caruso further opined that the appellant's medical condition caused him to be unable to appreciate the wrongfulness of his actions. He stated that the appellant's delusions made him believe he was acting in self-defense.

On cross-examination, Dr. Caruso agreed that the appellant had the capacity to think clearly and plan his attack, but that his mental illness caused him to misperceive the situation. He also agreed that mental illness would not necessarily preclude the appellant's ability to appreciate the wrongfulness of an act.

Dr. Rokeya Farooque and Dr. Samuel Craddock testified in rebuttal. Dr. Farooque opined that the appellant suffered from adjustment disorder with disturbance of emotion and conduct and borderline personality disorder. However, she stated that the appellant had some ability to reflect, use judgment and premeditate and that he was able to appreciate the wrongfulness of his actions.

Dr. Craddock testified that, based on all available information and interviews, the appellant was aware of the nature of his actions and that he had the capacity to appreciate the wrongfulness of assaulting another person. In addition, Dr. Craddock also agreed with Dr. Farooque's opinion that the appellant has some capacity to reflect or use judgment and to premeditate.

The Insanity Defense in Tennessee

Tennessee recognizes legal insanity as an affirmative defense to prosecution for a criminal act under certain circumstances. Tennessee Code Annotated section 39-11-501 provides:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501. Under this statute the defense applies only when the defendant has a severe mental disease or defect which results in his or her inability to "appreciate the nature or wrongfulness" of his or her acts. See State v. Flake, 88 S.W.3d 540, 550 (Tenn. 2002) (Flake I); see

also State v. Flake, No. W2001-00568-SC-R11-CD, 2003 WL 21788920 (Tenn. Aug. 5, 2003) (Flake II). In addition this statute squarely places the burden of establishing the defendant's insanity by "clear and convincing evidence on the defendant," and unlike prior law, the State has no obligation to offer evidence establishing the defendant's sanity. See Flake 88 S.W.3d at 550.

In Flake I the Tennessee Supreme Court held that under current law, when reviewing a jury's rejection of the insanity defense, an appellate court should reverse that decision only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. See Flake 88 S.W.3d at 554. The Court explicitly rejected any notion that the State must rebut defense proof of insanity with substantial evidence and noted that the current statute imposes no burden whatsoever on the prosecution. See id. In determining the propriety of the jury's rejection of the insanity defense, the supreme court emphasized that an appellate court must consider all the evidence in the record, including the defendant's actions and words at or near the time of the offense and the lay and expert testimony on the issue of sanity. See id. Thus, it is clear that the supreme court of this state has explicitly rejected the instant defendant's argument that the State was required to rebut defense proof on the issue of sanity.

Reviewing the evidence in this case under the principles outlined above, it appears that the appellant has failed to meet his burden of demonstrating to this Court that no reasonable trier of fact could have failed to find that the appellant was insane.

Witnesses testified that earlier in the evening, prior to shooting the deputies, the appellant appeared calm after having been in a fight in Lewis County. During the stand-off with the deputies the appellant made specific threats to kill the deputies, or "pigs," as he referred to them. The testimonies of both Drs. Farooque and Craddock established that although the appellant has some mental instability he nevertheless could understand that his actions were wrong. Under these circumstances we cannot say that no reasonable juror could have failed to find that the appellant was insane. Thus, the jury was well within its province in rejecting the insanity defense.

Premeditation

The appellant maintains that expert testimony established his inability to "premeditate" his actions and therefore he could not be found guilty of attempted first degree murder which has "premeditation" as one of its elements. See Tenn. Code Ann. §§ 39-12-101, 39-13-202. We must respectfully disagree.

Both Drs. Farooque and Craddock testified that while the appellant has some mental impairment, he was nevertheless able to reflect and use judgment about his actions. These experts diagnosed the appellant as delusional and paranoid based on his apparent belief that the deputies were in a conspiracy with drug dealers to kill him. However, as this Court has previously stated, "a criminal defendant may fix his thoughts upon murder and form an opinion or conclusion thereon prior to committing the murder although the facts upon which he bases his intent to kill are the

-6-

product of delusions stemming from a mental illness or defect." State v. Daryl Keith Holton, No. M2000-00766-CCA-R3-DD, 2002 WL 1574995, at *19 (Tenn. Crim. App., at Nashville July 17, 2002) (automatic death penalty appeal pending).

Whether a defendant has acted with premeditation is a question of fact for the jury to determine, and it may be inferred from the manner and circumstances of the killing. See State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). In this case the appellant may have believed that the deputies were part of some conspiracy. However, he was aware they were law enforcement officers, he was aware they had come to take him into custody, he lay in wait in a prone posture to ambush the deputies and he verbally threatened them. From this evidence the jury could legitimately conclude that the appellant premeditated his attempt to kill at least one of the officers. This issue is without merit.

Conclusion

In light of the foregoing the judgments of conviction are AFFIRMED.


                               _____

                               JERRY L. SMITH, JUDGE