IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 10, 2003 Session
Heard at Dyersburg

## STATE OF TENNESSEE v. CHRISTOPHER M. FLAKE

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 97-09254 & 97-09255     Bernie Weinman, Judge**

---

**No. W2001-00568-SC-R11-CD - Filed August 5, 2003**

---

E. RILEY ANDERSON, J., dissenting.

The majority has concluded that the jury reasonably found that the defendant's insanity at the time of the offenses was not established by clear and convincing evidence. I disagree.

My review of the evidence in the record indicates that the lay and expert testimony overwhelmingly established that the defendant suffered from the severe mental illness of paranoid schizophrenia and was unable to appreciate the nature or wrongfulness of his conduct when he tragically shot and killed Mike Fultz and Fred Bizot on April 5, 1997. See Tenn. Code Ann. § 39-11-501(a) (1997). I would hold that no reasonable trier of fact could have failed to find that the defendant's insanity *at the time of the offenses* was established by clear and convincing evidence. I would affirm the Court of Criminal Appeals' judgment, and I therefore dissent.

### I

Before July of 1995, the defense of insanity in Tennessee required evidence that "as a result of a mental disease or defect," a defendant "lacked substantial capacity either to appreciate the wrongfulness of [his or her] conduct or to conform that conduct to the requirements of the law." Tenn. Code Ann. § 39-11-501 (repealed 1995). Under this statutory standard, if evidence at trial raised a reasonable doubt as to the defendant's sanity, the prosecution had the burden of proving the defendant's sanity beyond a reasonable doubt." State v. Flake, 88 S.W.3d 540, 550 (Tenn. 2002) ("Flake I").

Effective July 1, 1995, the legislature fundamentally altered and significantly narrowed the defense of insanity in Tennessee. See Flake I, 88 S.W.3d at 540-41. The defense of insanity now requires that a defendant, "as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts." Tenn. Code Ann. § 39-11-501(a) (1997).

Moreover, the statute now places the burden on the defendant to establish the affirmative defense by "clear and convincing evidence." Id. As we said in Flake I, "clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Flake I, 88 S.W.3d at 551.

In Flake I, the Court was confronted with determining the proper standard of review to account for the revised and substantially narrowed statutory framework governing insanity. Flake I, 88 S.W.3d at 551. The Court unanimously adopted a standard under which a jury verdict rejecting the insanity defense should be reversed only when an appellate court, viewing the evidence most favorably to the prosecution, concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. Id. at 553-54. The Court majority believed that "this standard does not totally insulate the jury's finding from appellate review" but instead "enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying." Id. at 554.

Although I concurred in the adoption of the standard of review in Flake I, I disagreed with the majority's application of it to the facts and circumstances in that case,[1] and I dissented on the basis that "virtually all of the lay and expert testimony established the defendant's insanity *at the time of the offense*." Id. at 557 (Anderson, J., dissenting) (emphasis in original). Moreover, I wrote that "by upholding the jury's verdict under the facts and circumstances of [that] case, the majority has made appellate review of a jury's verdict meaningless and useless." Id. at 560 (Anderson, J., dissenting). In my view, the majority's application of the standard to the evidence in the present case has again completely insulated an unreasonable jury verdict from meaningful appellate review.

## II

In this case, the prosecution established that the defendant, Christopher M. Flake, was an acquaintance of both Mike Fultz and Fred Bizot and that he shot both victims without apparent provocation. The prosecution produced no evidence, however, establishing that the defendant had ever expressed an intent or desire to commit acts of violence against the victims and no evidence indicating that the defendant had any expressed motive or reason for his conduct. The prosecution also produced no eyewitnesses to either offense and no lay or expert testimony describing the defendant's mental state immediately before, during, or after the offenses on April 5, 1997.

In contrast, the defense presented overwhelming lay and expert evidence of the defendant's history of mental illness and his mental state before, during, and after the offenses. For instance, Michael Musso, the defendant's co-worker at Cooper Moving Company, was the *sole* witness who described the defendant's conduct and mental state shortly before the offenses on April 5, 1997. Musso testified that the defendant seemed "unusually agitated" that day, that he spoke even less than

---

[1] The defendant was convicted of attempted voluntary manslaughter for the shooting of Turner Carpenter on April 6, 1997. The defense presented an insanity defense based on nearly the same lay and expert testimony presented in the present case. Flake I, 88 S.W.3d at 542.

normal, and that he took an unusual number of breaks to smoke, even though he was in the presence of customers who were paying them by the hour. Musso also described a bizarre incident that day in which the defendant asked to borrow money for lunch but then tore up a hamburger into small pieces without eating any of it. Musso testified that the defendant's work performance that day was "really bad," and he later asked that he not be assigned to work with the defendant.

The defendant's father, James Flake, testified that the defendant had a lengthy history of mental illness, depression, and substance abuse. According to Flake, the defendant was 11 or 12 years of age when he began to withdraw socially and have trouble with his grades. The defendant had few friends and began having disciplinary problems. James Flake consulted a church counselor when the defendant was in ninth grade, and the counselor suggested that the defendant should see a mental health professional.

The defendant began seeing a psychiatrist, Dr. Richard Luscomb, for a period of three or four years. He began drinking, however, suffered from depression, and continued to decline academically. The defendant was hospitalized for substance abuse and depression on three occasions. In 1988, the defendant was admitted to Parkwest Hospital for sixty days. When released, he began attending Alcoholics Anonymous six nights per week. In 1989, the defendant was hospitalized for another sixty days due to substance abuse and depression. Although the defendant transferred to a high school that had a support group for students with substance abuse issues, he continued to deteriorate and suffer from depression. In 1990, the defendant was hospitalized a third time for substance abuse and depression.

James Flake testified that the defendant graduated from high school but dropped out of a Mississippi junior college after only one semester because he had grown "angry, frustrated, and depressed." The defendant next attended the University of Tennessee at Martin from 1991 to 1993; while he improved academically, the defendant still returned home each weekend and appeared depressed and angry. The defendant later dropped out of UT-Martin and attended Shelby State Community College from 1993 to 1995, where he managed only a 1.8 grade point average.

James Flake testified that the defendant saw Dr. Melvin Goldin, a Memphis psychiatrist, from 1993 to 1995, and Dr. Janet Johnson from 1995 to 1997,[2] but that his condition did not improve. Flake recalled the defendant saying at various times, "my head is messed up," "my mind is blank," and "I don't know who I am." The defendant isolated himself, refused to trust anyone, and lost several jobs. Flake testified that the defendant's academic skills continued to erode and that he had the writing ability of an elementary school student. Although the defendant enrolled at the University of Memphis, he passed only two of six courses.

James Flake testified that the defendant's condition continued its downward spiral throughout February and March of 1997, and up until the offenses in this case. The defendant was depressed,

_____

[2] The evidence in the record later revealed that Dr. Janet Johnson was a physician who specialized in substance abuse and addiction. She was deceased at the time of the trial.

remained in bed much of the time, and often made bizarre remarks, which included the following:

- In February or early March of 1997, the defendant stated that his A.A. sponsor was "running drugs from Mexico" and that another sponsor was going to "beat him to death with a baseball bat."

- The defendant said that he had caused a recent airliner crash in Florida.

- The defendant wrote the name of his elementary school principal on a piece of paper with the words, "the first woman to hit me."

- The defendant told his father that a grade school classmate told him that an elementary school teacher had "bad mouthed him." The defendant also told his father that "Buchanani has the answer."

- The defendant told his father that he was "getting closer to the answer" and gave his father a business card and other "important papers" to hold onto.

- The defendant said that he knew who was responsible for the Oklahoma City bombing and the 1993 World Trade Center bombing.

In March of 1997, the defendant drove to a convenience store in a thunderstorm, took cigarettes, smiled and waved at the clerk, and then left without paying. When the police arrived to investigate the theft, James Flake drove the defendant back to the store to pay for the cigarettes. The defendant was angry, insisted that he was owed the cigarettes, and had no remorse.

On April 1, 1997, only four days before the offenses in this case, James Flake believed the defendant was deteriorating and arranged for him to meet with Dr. Johnson. Dr. Johnson gave the defendant an envelope containing samples of Prozac intended to last for two weeks. On the very next day, however, Dr. Johnson called James Flake and told him that she had received a telephone call from a man who had found the envelope with the Prozac samples in his mailbox. The defendant said that he had placed the Prozac in the mailbox because he believed the man, who he did not know, needed help. According to James Flake, it was around this time that the defendant had pulled a fire alarm at the University of Memphis because a professor had changed his assignment.

James Flake testified that when he finally asked the defendant why he was acting so strangely, the following exchange occurred:

> [The defendant] was sitting on the edge of his bed and he turned and looked at me for about ten seconds. I was petrified by his look. I can only describe it as it appeared that his eyes had even changed colors. It was as if he was burning right through me. He thought for ten seconds and his answer to what had caused him to do these things

4

was the opening of the new Wolfchase Galleria Mall. I knew at that
point that I believed my son had lost his mind.

Flake made another appointment for the defendant with Dr. Johnson on April 3, 1997, during which both he and Dr. Johnson tried to convince the defendant to voluntarily commit himself. The defendant refused, saying that "they had never helped him before" and that he believed "everything was okay."

The record reveals that in March of 1997, *i.e.*, in the midst of this period of bizarre behavior and deteriorating mental health, the defendant applied for a handgun. He completed the application and related paperwork by withholding his history of mental illness, hospitalizations, and substance abuse. On April 4, 1997, the defendant retrieved the weapon from the store by filling out additional paperwork. On the very next day, the defendant committed the offenses.

James Flake testified that he did not know the defendant had applied for and purchased a handgun. On April 5, 1997, *i.e.*, the day the victims were shot and killed, the defendant returned home around 11:00 p.m. following an A.A. meeting. Flake asked the defendant if everything was okay and the defendant said, "yes." The next morning, April 6, 1997, the defendant had breakfast, kissed his mother, and seemed to have a "regular" morning. Later that day, however, the defendant shot a third person, Turner Carpenter, at a nearby church.

On the night of April 6, 1997, James Flake received a telephone call indicating that the defendant was a suspect in a shooting. When the defendant arrived home, James Flake told him to cooperate with authorities. He testified that the defendant had a "blank" look when arrested.[3] The police officers' search of the defendant's room after his arrest revealed a large quantity of prescription Zoloft and Cylert that the defendant obviously had not taken as prescribed.

Turner Carpenter testified on the defendant's behalf. Carpenter said that he had been introduced to the defendant in his position as a pastoral counselor with an addiction and dependency program. After missing several prior appointments, the defendant arrived at Carpenter's office around 6:00 p.m. on April 6, 1997, and asked to meet with him. The defendant appeared "normal," and he spoke in a normal voice. Carpenter agreed to meet with the defendant after he finished meeting with another individual. A few minutes later, however, Carpenter saw the defendant in his outer office. The defendant "leaped out from the couch" and "screamed" Carpenter's name, "just as loud as he could scream it." The defendant, who Carpenter described as "horrible looking" and "angry as the devil," pointed a gun and fired one shot; the bullet struck Carpenter's hand and penetrated his lung, liver, and diaphragm. Carpenter testified that there had been no ill will or animosity between he and the defendant and that he had no rational explanation for why the defendant shot him.

---

[3] One officer testified that the defendant showed no emotion but looked "tired" during the arrest. When an officer asked about an "altercation," the defendant said that he had "shot a guy." The defendant executed a consent to search form and told officers where to find the gun.

In addition to these lay witnesses, the defense introduced the expert testimony of seven mental health professionals who related the defendant's lengthy history of mental illness, treatment, and medications. Moreover, *six* of the mental health experts, both psychiatrists and psychologists, performed numerous, comprehensive evaluations and determined that the defendant suffered from a severe mental illness, schizophrenia, and was unable to appreciate the wrongfulness of his conduct when shooting the victims. Indeed, the record reveals that after the offenses and prior to trial, the defendant was examined by a number of psychiatrists and found by the trial court to be incompetent to stand trial for a period of over two years after the offenses. The trial court declared him competent to stand trial only after the State had furnished extensive treatment and anti-psychotic medication over the two years following the offenses.

The first expert witness to testify for the defense, Dr. Melvin Golden, stated that he saw the defendant approximately 17 or 18 times between 1991 and 1995. He related that the defendant had been under the care of Dr. Richard Luscomb since 1988, that the defendant had been hospitalized three times, and that the defendant had thoughts of suicide that led to his hospitalization in 1989 and 1990. He recalled that the defendant reported "homicidal thoughts" about persons who frustrated him. Dr. Goldin diagnosed the defendant with obsessive compulsive disorder and prescribed medicine for depression. Dr. Goldin offered no testimony on the defendant's mental state at the time of the offenses in this case.

The next mental health professional to testify was Dr. Lynne Zager, a clinical psychologist and Director of the Forensic Services Program at Midtown Mental Health Center. Pursuant to a State-requested court order, Dr. Zager examined the defendant from October 1997 to January 1998 to determine both his competency to stand trial and his mental state at the time of the offenses. Dr. Zager testified that she interviewed the defendant four times, that the defendant suffered from a "severe, persistent mental illness," *i.e.*, paranoid schizophrenia, and that due to the mental illness, the defendant could not appreciate the nature or wrongfulness of his conduct during the shootings on April 5, 1997.[4]

Dr. Zager testified that persons suffering from schizophrenia form "false fixed beliefs," delusions, and possible hallucinations. She testified that the defendant claimed to hear voices that were broadcast to others and that the defendant believed the victims were responsible for the bombings in Oklahoma City and at the World Trade Center. She testified that the defendant believed that the victims were homosexuals who made him feel uncomfortable and that the defendant said that he had a list of 140 names of persons he had planned to kill. According to Dr. Zager, the defendant believed his actions "were to protect society, to protect himself, [and] to protect his family."

---

[4] The majority notes that Dr. Zager conceded on cross-examination that John Perry, the mental health services coordinator at the Shelby County Jail, told her that the defendant "was not really sick" and was "pulling one" on the evaluation team. Perry did not testify, however, and there was no evidence regarding his medical or other qualifications, if any, or the basis for his opinion.

The next expert to testify was Dr. Sam Craddock, a state-employed clinical psychologist at Middle Tennessee Mental Health Institute. Dr. Craddock testified that a team of mental health workers evaluated the defendant from November 17, 1997 to December 16, 1997; the evaluation team consisted of himself, a psychiatrist, a master's level social worker who gathered the defendant's social and medical histories, and nurses and technicians who observed the defendant's everyday conduct. Dr. Craddock explained that the "goal of the team is to come up with a diagnosis and to report back to the Court what we think the person's mental disability is, if there is one." He acknowledged that he most often testifies on behalf of the prosecution because his findings and conclusions frequently are not favorable to the defendant.

Dr. Craddock testified that he administered several psychological examinations to the defendant including the Shipley Institution of Learning Scale to measure verbal comprehension, a Booklet Category test to measure reasoning, a Minnesota Multi-phasic Personality Inventory, ("MMPI - II test"), and a Personal Assessment Inventory. Dr. Craddock testified that he evaluated each assessment for indicia of malingering and that the defendant's symptoms were genuine:

> [A]t times, it certainly came to my mind that he might be malingering. Just because I have test scores that say one thing. His parents provided input. And I'm not going to rule out the possibility, at any time, that he might be malingering. But, once I decided that I was looking at genuine symptoms, he expressed a number of delusional beliefs, false beliefs, ideas that had no basis in reality [] that things were going on that are consistent with somebody that has schizophrenia and particularly paranoid thinking.

In diagnosing the defendant with paranoid schizophrenia, Dr. Craddock explained that the defendant's symptoms evolved over a period of years:

> [The defendant] had not been diagnosed schizophrenic before he came to our facility. A frequent diagnosis in his past was depression. He also had a diagnosis of abusing alcohol, or other substances. I think it's well known in the literature, there's good literature out there. I think it very well describes [the defendant's] evolving symptoms that finally came to be recognized as schizophrenia.

Dr. Craddock concluded that the defendant suffered from this serious mental illness at the time of the shootings on April 5, 1997. Although he could not address the issue of whether the defendant appreciated the wrongfulness of his conduct, Dr. Craddock testified that the defendant "perceived [that] the shootings were right" and that he felt "morally justified" because he falsely believed the victims were terrorists.

Also testifying for the defense was Dr. Rokeya Farooque, the psychiatrist at Middle Tennessee Mental Health Institute who evaluated the defendant along with Dr. Craddock and the team of mental

7

health professionals. Dr. Farooque reviewed the defendant's medical records, which indicated the defendant had experienced prior hallucinations associated with drug abuse, blackouts, major depression, an anxiety disorder, and an obsessive-compulsive disorder. Dr. Farooque noted that the defendant had received psychiatric treatment, including hospitalization, for his prior conditions.

Dr. Farooque testified that the defendant suffered from paranoid schizophrenia and described the defendant's delusional thinking:

> [H]is delusional thinking was that the victims of his charges, one of them was responsible for the Oklahoma bombing. One of the them was responsible for the World Trade Center bombing and [the defendant] worked for [the] FBI, so he's going to take care of them and that's not wrong, because he's doing society a favor by taking care of the terrorists. . . . And that was fixed in his mind that whatever he did, that was not wrong, [] because they are terrorists.

Dr. Farooque concluded that the defendant suffered from paranoid schizophrenia and was incapable of appreciating the nature or wrongfulness of his acts in committing the offenses on April 5, 1997.

The next expert witness on behalf of the defense was Dr. John Aday, a state-employed psychologist on the forensic unit of the Western Mental Health Institute. Dr. Aday testified that the defendant was transferred to his facility in November of 1998, and that he was evaluated for his competency in February of 1999. Although found to be competent to stand trial, the defendant "had a major thought disorder[,] continue[d] to actively hallucinate and [his] delusions concerning the victims remain[ed] intact." Dr. Aday concluded that the defendant suffered from paranoid schizophrenia based on his hallucinations, delusions, flat affect, and speech. The defendant indicated that he was a government agent and that he did not believe that shooting the victims was wrong.

Dr. Hilary Linder, a practicing psychiatrist for thirty-three years employed by the State at Western Mental Health Institute, also testified for the defense. He testified that the defendant had been his patient since being transferred from Middle Tennessee Mental Health Institute in November of 1998. Dr. Linder concluded that the defendant suffered from paranoid schizophrenia at the time of the offenses on April 5, 1997, and that the defendant did not know it was wrong to shoot the victims. Dr. Linder said that he observed the defendant five days a week for nearly two and a half years and that the defendant was not malingering or feigning a mental illness.

Finally, Dr. John Hutson, a clinical psychologist employed by the defense, testified that he interviewed the defendant on April 8, 1997, and later interviewed the defendant and his parents on numerous occasions. The defendant was "very difficult to interview," "very disturbed," and "hard to keep focused." Dr. Hutson evaluated the defendant, reviewed his lengthy history of mental illness, and administered several tests. He testified that the defendant's results on an MMPI-II test showed that "he was very disturbed, extremely disturbed actually," and that "the paranoia scale and the

schizophrenia scale were elevated well beyond the level of psychopathology." Dr. Hutson further explained that the results did not indicate that the defendant was malingering.

Dr. Hutson concluded that the defendant had either paranoid schizophrenia or chronic undifferentiated schizophrenia and could not appreciate the wrongfulness of his actions on April 5, 1997. Dr. Hutson testified that the defendant had "delusions, hallucinations, occasional disorganized speech and virtually no affect," and that the defendant believed that he was working as a government agent when he shot and killed the victims. Dr. Hutson testified that the defendant was "one of the three most disturbed criminal defendants" that he had ever seen among the over 10,000 persons he had evaluated in his career as a mental health professional.

Not a single expert witness testified on behalf of the prosecution.

Accordingly, *all* of the mental health professionals who completed lengthy, comprehensive evaluations of the defendant consistently determined that he suffered from a severe mental illness. Six mental health experts concluded that the defendant suffered from the severe mental illness of paranoid schizophrenia and was unable to appreciate the wrongfulness of his conduct on April 5, 1997. These professionals had years of experience in conducting competency and mental state evaluations. Five of the expert witnesses were employed by the State of Tennessee and had no motive to provide testimony favorable to the defense; indeed, Dr. Craddock testified that he nearly always testifies on behalf of the prosecution because his conclusions are rarely helpful to the defendant.

In contrast, the State presented no lay or expert testimony showing either that the defendant did not have a severe mental illness or that he could appreciate the wrongfulness of his conduct at the time of the offenses.

### III

It is with this overwhelming evidentiary record in mind that I turn to the issue of whether the jury reasonably found that the defendant's insanity at the time of the offenses was not established by clear and convincing evidence. The majority applies the standard under Flake I, yet concludes that the jury's verdict was supported by the evidence. I disagree.

The majority argues that the defendant's sanity was demonstrated by his ability to obtain a handgun and his "forethought" in providing false answers on the purchase application and background check. There was no evidence, however, that a person suffering from paranoid schizophrenia would be incapable of such conduct; indeed, all of the expert testimony indicated that a person with schizophrenia is capable of acting "normally" at times, just as the defendant appeared "normal" to Turner Carpenter seconds before he was shot. Moreover, the defendant's conduct in applying for and obtaining a handgun was initiated weeks before the crimes and shed no light on his mental state *at the time of the offenses*.

The prosecution offered no eyewitnesses to the crimes and no evidence regarding the defendant's mental state during the shootings. Only a single witness, Michael Musso, testified about the defendant's behavior and mental state on the day of April 5, 1997. Musso, the defendant's co-worker, stated that the defendant's behavior was extremely unusual and that his work performance that day was "really bad." Moreover, the testimony of James Flake vividly illustrated that the defendant's purchase of the handgun occurred in the midst of the defendant's continued mental deterioration, bizarre conduct, delusional thinking, and apparent failure to take his prescribed medication.

The majority also observes that the jury may have found that the defendant's motive for shooting the victims was in someway related to the defendant's alleged fear of homosexuals. Although the prosecution's cross-examination of several of the mental health professionals alluded to this point, each expert witness consistently reiterated that the defendant's schizophrenia was characterized in part by delusional thinking. The defendant believed, for instance, that the victims were terrorists who were responsible for bombings in Oklahoma City and the World Trade Center in the early and mid-1990s. The defendant also believed that he was a government agent, that he was morally justified in killing the victims, and that he was protecting himself, his family, and society in killing the victims. In this context, it is difficult to fathom how the defendant's delusional belief that the victims were homosexuals created a *reasonable* inference that the defendant's actions were the product of a rational or "sane" mind. In short, the evidence of what the majority has described as an "alternative explanation" for the commission of the crimes was speculative at best and failed to reasonably rebut the evidence of the defendant's mental illness and his inability to appreciate the wrongfulness of his actions.

The majority argues that the State's cross-examination of the defense experts suggested that the defendant was faking a mental illness because he never complained of auditory hallucinations until after these offenses were committed and because he indicated to one expert that he did not want to be "caught" committing the offenses. The malingering theory, however, was thoroughly refuted by the evidence. Both the lay and expert testimony revealed that the defendant's history of mental illness, including his three prior hospitalizations and extensive mental health intervention, spanned a period of *over ten years* before the offenses were committed. Moreover, the expert testimony revealed that the defendant was examined, evaluated, tested, and interviewed by no fewer than six psychologists and psychiatrists for *over two years* after the offenses on April 5, 1997. Every single mental health professional who evaluated the defendant concluded that he suffered from a serious mental illness and was not malingering.

Despite this overwhelming evidence, the majority emphasizes Dr. Craddock's statement that he was "not going to rule out the possibility at any time, that he might be malingering." The context of this testimony, however, was as follows:

> [A]t times, it certainly came to my mind that he might be malingering.
> Just because I have test scores that say one thing. His parents provided
> input. And I'm not going to rule out the possibility, at any time, that

he might be malingering. But, once I decided that I was looking at genuine symptoms, he expressed a number of delusional beliefs, false beliefs, ideas that had no basis in reality [] that things were going on that are consistent with somebody that has schizophrenia and particularly paranoid thinking.

In my view, the entire quote reveals that the statement relied upon by the majority simply refers to Dr. Craddock's state of mind *during* the examination and testing of the defendant and not to his conclusion *after* completing the evaluation. Indeed, Dr. Craddock's very next sentence indicated that he "decided that [he] was looking at genuine symptoms" and that the defendant "expressed a number of delusional beliefs, false beliefs that had no basis in reality. . . ."

The majority also relies upon a statement made by John Perry, the mental health services coordinator at the Shelby County Jail, who allegedly told Dr. Zager that the defendant "was not really sick." Neither Perry's medical qualifications nor the basis for his conclusions are found in the record. Indeed, it is telling that the prosecution did not present Perry as a witness in its case in chief.

In short, not a single mental health expert concluded that the defendant was malingering, and not a single mental health expert testified that the defendant's failure to report auditory hallucinations before the offenses affected the question of whether he suffered from paranoid schizophrenia. Accordingly, the evidence cited by the majority did not refute the evidence of the defendant's serious mental illness or his inability to appreciate the wrongfulness of his actions at the time the offenses were committed.

This was not a case in which expert witnesses offered different opinions regarding the defendant's mental state. All were unanimous in the view that the defendant suffered from a severe mental illness, schizophrenia, and that he could not appreciate the wrongfulness of his conduct. This is also not a case in which there was lay testimony regarding the facts and circumstances of the offenses that created reasonable inferences that differed from the expert testimony. In short, I once again find no basis in this record for the jury to have reasonably rejected the expert and lay evidence regarding the defendant's serious mental illness and his inability to appreciate the wrongfulness of his acts at the time of the offense.

As I feared in Flake I, the majority's application of the standard of review to the even stronger evidence of insanity in this case has once more rendered appellate review of the jury's verdict all but meaningless. Indeed, it is now difficult to imagine a case that will warrant a reversal of the jury's verdict on the issue of insanity.

Accordingly, I disagree with the majority's conclusion and would affirm the Court of Criminal Appeals' determination that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence.

11

_____
E. RILEY ANDERSON, JUSTICE