IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 23, 2008 Session

## STATE OF TENNESSEE v. RICHARD ANTHONY ARRIOLA

### Appeal from the Criminal Court for Davidson County
No. 95-D-2835     Monte Watkins, Judge

_____

### No. M2007-00428-CCA-R3-CD - Filed May 8, 2008

_____

After conducting a bench trial, the trial court found the Defendant, Richard Arriola, guilty of one count of first degree murder, one count of attempted first degree murder, and two counts of attempted second degree murder. The trial court sentenced the Defendant to an effective sentence of life imprisonment plus fifteen years. On appeal, the Defendant contends that the trial court erred when it: (1) used an improper legal standard for an insanity defense because it required the Defendant to prove both that he was unable to appreciate the nature of his acts and that he was unable to appreciate the wrongfulness of his acts; and (2) sentenced the Defendant to consecutive sentences. After a thorough review of the case and the applicable law, we remand this case to the trial court for the clarification of its factual findings with respect to insanity.

**Tenn. R. App. 3 Appeal; Judgment of the Criminal Court Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Jeffrey DeVasher, Nashville, Tennessee (on appeal); Ross Alderman and J. Michael Engle, Nashville, Tennessee (at trial), for the Appellant, Richard Arriola.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Roger Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Facts

### A.  Trial

This case arises from a standoff between the Defendant and the Davidson County Sheriff's Department on September 22, 1995, which resulted in the death of Officer Jerry Newsome. The Defendant was indicted on charges of one count of first degree murder, one count of attempted first degree murder, and two counts of attempted second degree murder. The Defendant waived his right to a jury trial. At his trial, the relevant evidence included: the Defendant was a well-adjusted and active young man as he completed high school. After enrolling in college at the University of Tennessee-Martin, he began exhibiting symptoms of mental illness. According to his mother, Viola Couser, and his brother, John Arriola, the Defendant became reclusive and paranoid. After completing only one trimester, the Defendant left college and moved back home to Nashville. He then traveled around the world, later claiming to have visited Jerusalem and to have joined a religious group in Florida.[1] When the Defendant would "travel," he would leave home for months at a time, taking only a "pack on his back" and not tell his family his plans. The Defendant also enlisted in the Navy (and was discharged after three to four months for an unknown reason) and got married for less than a month. When he was in Nashville, he worked at his step-father's restaurant peeling potatoes. While he was at home, he engaged in peculiar activities like preaching on street corners and on his front porch when no one was near him to listen. He always carried a Bible with him, and he repeatedly tried to baptize his family. The Defendant was even arrested once for preaching outside in the rain.

According to Couser, the Defendant was first hospitalized for mental health treatment in 1987. He remained at Middle Tennessee Mental Health Institute (MTMHI) for thirty days, where the doctors diagnosed him with paranoid schizophrenia. The Defendant was released with orders to stay on his medicine and continue treatment, but he did neither. The Defendant was hospitalized at MTMHI for another thirty days in 1988, where he was treated again for paranoid schizophrenia. Similar to before, upon release, he refused to take his medication. Around 1989 or 1990, the Defendant moved from the upstairs of his parents' house into their basement, which he kept "cluttered up," according to his mother. The Defendant was hospitalized a third time in 1991 at Baptist Hospital as a result of judicial order. The Defendant had gotten into a fist fight with his older brother, John, over the issue of the Defendant not bathing regularly. John agreed to drop the charges if the Defendant entered an inpatient treatment facility. He was kept for thirty days, treated for paranoid schizophrenia, and released. According to Couser, after the Defendant was released, he stopped his treatment; when describing one manifestation of her son's illness when he stopped his medication, she said, he "wasn't keeping himself clean. He grew the beard and he wasn't getting his hair cut."

In September 1995, the Defendant began posting signs for his "businesses" in his neighborhood. The Defendant thought he ran a scuba diving business, an electrician business, and an advertising business. When the police served his parents with a warrant, ordering that the signs be removed or they pay a fine, the Defendant threatened the police with his neighbor's dogs. The Defendant's parents took down his signs to avoid paying a fine, but the Defendant replaced the signs and refused to remove them. The Defendant's parents both thought if they served the Defendant

---

[1] The testimony is very unclear about specific dates or a timeline for these various activities.

with an eviction warrant, the judge could commit the Defendant for treatment or, at least, have the Defendant agree to treatment, similar to what happened in 1991.

On September 22, 1995, Officer Johnnie Spears and Officer Jerry Newsome arrived at the Defendant's house to serve him with the eviction warrant. Officer Spears wore his badge in a visible location, and Officer Newsome wore a green and tan Sheriff's Department uniform. They knocked on the door with their night sticks, to avoid another threat involving the neighbor's dogs. The Defendant "came out sideways with his hand behind his back. . . . He was cussing." Officer Spears said he dropped the warrant on the ground, and as he started to turn, "that's when [the Defendant] shot me in the mid-section, and it knocked me down." Officer Spears also saw Officer Newsome "grab his chest and fall." Officer Spears said the Defendant was originally firing a handgun, but as he made his way back to his police cruiser to call for help, the Defendant began using a camouflaged shotgun. Officer Spears thought Officer Newsome was dead because he never saw him move after falling. Officer Spears made a radio call signaling that a "police officer [was] in serious danger."

Officer Mike Hagar arrived at the scene after hearing the radio call. He saw Officer Newsome lying in the grass and not moving. After additional police arrived, they realized the Defendant was still in the basement, and they called for the SWAT team. Officer Hagar stated that the Defendant's brother, John Arriola, came to the scene and warned them that the Defendant was schizophrenic. Officer Hagar said that, while he was at the scene, no shots were fired before the SWAT team went into the house.

When the SWAT team arrived, they divided up into two teams: one for the upstairs portion of the house and one for the basement portion of the house. They initially tried negotiating with the Defendant, but there was no response. After the negotiation failed, the SWAT team began to move into the house. Before the basement team made it into the house, they began "drawing fire" from the Defendant after throwing two "distraction devices" into the house. Distraction devices are stun grenades that "cause[] a concussion. . . . And if [a person is] looking at it the flash will temporarily blind them." After throwing in the second device, the SWAT team heard gun shots. According to Officer Randy Hickman, one of the SWAT team members on the "upstairs" team, "once we dropped the devices, [the Defendant] fire[d] two, approximately two shots, at us, up the staircase there. Then we g[a]ve commands to come out, and at which time he fired about, approximately, two more shots at us, up the steps. I could see the rounds ricochet."

As the SWAT team was "thinking of what [it was] going to do next, that's when the suspect came out" of the house. Officer Hyde said the basement was "filled with smoke," and, as the Defendant came out cursing, one SWAT team member kicked the Defendant's lower body to knock him on the ground. At that point, the Defendant tried grabbing the officer's weapon, but only managed to grab the strap. Eventually, the Defendant was arrested and put into a van for transport to the hospital to check on his injuries.

Officer Pat Postiglione, an officer on the murder squad, helped transport the Defendant to the hospital. He described the Defendant as "very subdued" and said the Defendant refused to give

a statement because "he didn't trust the government." Officer Larry Flair, another officer of the murder squad, characterized the Defendant as "coherent, conscious." In fact, the Defendant chose not to waive his *Miranda* rights when they were given to him, and he refused to give consent to search his property. Once the Defendant was out of the basement, various officers of the murder squad searched the basement for weapons. Officer Bill Pridemore described the basement as "very disarrayed. Things [were] scattered throughout the floor." The officers found a handgun in a hole in the drywall.

Doctor Bruce Levy, the current medical examiner for Nashville and a specialist in forensic pathology, testified that Officer Jerry Newsome was shot five times: three times with a handgun and two times with a shotgun. Three of the shots were quickly fatal.

Since the arrest, the Defendant has been housed at MTMHI and undergoing therapy and treatment for paranoid schizophrenia. Some of the Defendant's delusions included that his mother did not give birth to him; rather, he believed she found him at an airport. The Defendant also had a fascination with religion, and he believed he needed to baptize his family members in his bathtub. Dr. Rokeya Farooque, one of the Defendant's doctors at MTMHI, testified that the Defendant "[believed] that he would be the next Pope. He owned the government world bank. He owned the government of the United States." Additionally, he believed he invented the bar code. Dr. Farooque discussed the Defendant's "gradual deteriorating function" at great length. She said he was diagnosed again with paranoid schizophrenia in 1996, which took into account his bizarre behaviors, religious ideas, loose speech, hallucinations, delusional thinking, grandiose delusional thinking, and persecutorial delusional thinking. Dr. Farooque testified that on September 22, 1995, the Defendant was psychotic and was not able to appreciate the wrongfulness of his actions. In fact, she said he felt justified to defend himself because he thought he owned everything.

The Defendant was also treated by Dr. Samuel Craddock, who echoed Dr. Farooque's opinion that the Defendant could not appreciate the wrongfulness of his actions. Dr. Craddock described the Defendant as "suspicious of just about everybody that he encountered." He also stated that the Defendant believed he owned Palm Beach, Florida. Speaking of the September 1995 shooting incident, Dr. Craddock said, "I think even if [the Defendant] were a spectator, though, across the street watching what was occurring, I am not so sure that he could comprehend even what was going on he was so mentally ill, much less being able to participate and having the emotional involvement." Whenever the Defendant was asked about the shooting incident, he complained of "burning sensations." He also suffered from those sensations when the doctors suggested that he take some psychological tests. Moreover, Dr. Craddock conveyed that the Defendant told him that he would not have done anything illegal, implying that he did not know his shooting the police was illegal.

Dr. Patricia Corry explained that the Defendant had two "plans" as part of his mental illness. "Plan A" included all of his purely delusional thoughts, such as, he was going to become King Richard. "Plan B" included his thoughts and memories concerning the September 22, 1995, shooting. When talking about the shooting, the Defendant only recalls "intruding thoughts that -

really voices, or feelings, or things that - he thought he could float around outside his body, things that he could feel inside his body as well." The Defendant told Dr. Corry that he heard "voices that told him to shoot and kill anybody that messed with him." Dr. Corry said the Defendant thought the ship the Queen Mary II was on its way to Florida to take him and Vanessa Corona, one of the characters the Defendant created in his mind, to the Vatican. He believed that Corona was the District Attorney in Miami, Florida and that she would leave the United Stated with him when he became King Richard, the President of the United States, or the first American Jewish Pope. While in treatment, the Defendant planned which eighty-five countries he was going to conquer and rule when he became king. The Defendant consistently believed himself to be either a saint or a preacher. Dr. Corry also elaborated that the Defendant believed one of the deputies had a virus that "was just kind of free-flow" and it could move from computers to humans in the Defendant's thoughts. The Defendant was afraid of contracting this virus when the police came to his door. Additionally, the Defendant believed the CIA met in a church on West End Avenue in Nashville, Tennessee two months prior to the shooting.

The Defendant was in custody from 1995 until 2006 before he was deemed competent to stand trial. Dr. Ronnie Stout, another of the Defendant's doctors at MTMHI, said that the Defendant's treatment progress was very slow, partially due to the difficulty of ascertaining the proper medication for him.

After hearing this testimony, the trial court found the Defendant guilty of first degree murder, attempted first degree murder, and two counts of second degree murder. It sentenced the Defendant to an effective sentence of life imprisonment plus fifteen years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) used an improper legal standard for an insanity defense because it required the Defendant to prove both that he was unable to appreciate the nature of his acts and that he was unable to appreciate the wrongfulness of his acts; and (2) sentenced the Defendant to consecutive sentences.

### A. Insanity Defense Standard

The Defendant claims that the evidence establishes by clear and convincing evidence that the Defendant was legally insane at the time of the shooting and that, by requiring the Defendant to prove both that he did not appreciate the nature of his conduct and that he did not appreciate the wrongfulness of his conduct, the trial court utilized an improper legal standard for insanity. The State claims there was sufficient evidence showing the Defendant knew what he was doing when he killed and injured the police officers. At oral argument, the State also argued that the trial court's findings from the evidence presented showed that the trial court did not find the Defendant proved either that he could not appreciate the wrongfulness of his conduct or that he could not appreciate the nature of his acts.

This Court "should reverse a verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002). The Tennessee Supreme Court has even gone so far as to say, "when the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this . . . standard." *Id.* at 556. This same standard is also applied to findings from a bench trial. *State v. William Keith Matthews*, No. M2003-01889-CCA-R3-CD, 2005 WL 292422, at *8 (Tenn. Crim. App., at Nashville, Feb. 4, 2005), *perm. app. denied* (Tenn. May 23, 2005).

The statutory requirements for an insanity defense are described in Tennessee Code Annotated section 39-11-501:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature *or* wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(emphasis added) (1995). When interpreting a statute, courts should use the "natural and ordinary meaning[s of the statutory language], unless the legislature used [the words] in a specialized, technical sense." *BellSouth Telecomm., Inc. v. Green*, 972 S.W.2d 663, 673 (Tenn. App. 1997). The word at issue here is "or." There is no indication that the legislature used it in a specialized, technical way, therefore, we will assign it its natural and ordinary meaning. According to *Black's Law Dictionary* , "or" is "a disjunctive particle used to express an alternative or to give a choice of one among two or more things." *Black's Law Dictionary* 1095 (6th ed. 1990). We contrast that with the definition of "and," which is "a conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first." *Black's Law Dictionary* 86 (6th ed. 1990). Applying the correct definition of "or" to this statute, the plain meaning shows two distinct ways that the defendant may present a successful insanity defense: proving either that he could not appreciate the nature of his acts or, in the alternative, that he could not appreciate the wrongfulness of his acts. Moreover, to prevail, the Defendant need not prove both that he could not appreciate the nature of his act and that he could not appreciate the wrongfulness of his acts.

In the Defendant's case, several doctors who treated him testified that he could not appreciate the wrongfulness of his acts. They discussed at length that one of the Defendant's beliefs, due to his paranoid schizophrenia, was that he owned the world and had a right to defend it. He also truly believed that the deputies serving him with a warrant had a computer virus they could transmit to him through their thoughts. Additionally, the Defendant told one of his doctors that he would not do something illegal, implying that even though he shot the police officers serving him with a warrant, he did not appreciate the illegality of doing so. The State did not present any evidence to the contrary. When the trial court found the Defendant guilty, thereby finding that the Defendant did not successfully prove his insanity defense, it referred in detail to the expert testimony. After stating

that the experts agreed the Defendant could not appreciate the *wrongfulness* of his actions, the trial court then determined that the Defendant failed to prove that he did not appreciate the *nature* of his act:

> There were a number of experts who testified, particularly Dr. Farooque and Dr. Craddock who came and specifically testified that the defendant was unable to appreciate the wrongfulness of his acts. They had stated previously in their reports that he had qualified, or he was unable to appreciate the nature or wrongfulness of his act, but under questioning they would not specifically state that he was unable to appreciate the nature of his acts. So the Court has to look at the facts with respect to what occurred that day immediately before or some time before, immediately during the time of the incident, and shortly thereafter. . . .
>
> Based on all of that the Court is of the opinion that [the Defendant] did not carry a burden of proving by a clear and convincing evidence that he was unable to appreciate the nature of his acts. As such, the Court finds him guilty of first degree murder, guilty of attempted first degree murder, and guilty of two counts of attempted second degree murder.

In our view, the trial court's finding is ambiguous. It is unclear whether the trial court was merely summarizing the experts' testimony that the Defendant could not appreciate the wrongfulness of his actions, or whether the trial court was also accrediting the testimony and finding that the Defendant in fact could not appreciate the wrongfulness of his actions. Because we have the trial court's explanation of its ruling, we must consider it in conjunction with its final verdict. *See generally State v. Hood*, 868 S.W.2d 744 (Tenn. Crim. App. 1993). Given the ambiguity of the trial court's factual findings on whether the Defendant appreciated the wrongfulness of his actions, we cannot in good faith review the trial court's legal conclusions. *Id*. at 749 ("[T]he case cannot be resolved in this appeal because of the gaps in the trial court's findings."). Therefore, we must remand the case to the trial court for the entry of an order clarifying its factual findings. If the trial court determines by clear and convincing evidence that the Defendant, as a result of a severe mental disease or defect, in fact could not appreciate the wrongfulness of his actions, the order should vacate the convictions and indicate a verdict of "Not Guilty by Reason of Insanity" as to all counts. If the trial court determines that the Defendant did not prove by clear and convincing evidence that, as a result of a severe mental disease or defect, he was unable to appreciate the wrongfulness of his acts, the order shall include that determination.

## B. Consecutive Sentencing

In the event of further review, we will address the issue of consecutive sentencing. The State argues that the Defendant is a dangerous offender, which permits the trial court to impose consecutive sentences for these crimes.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103 (1990), we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the offense, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. T.C.A. § 40-35-115(b)(4) (2005). In addition, when a court is ordering consecutive sentences because it finds the defendant to be a dangerous offender, it must also find that the "extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). The trial court in this case found that, "Because one individual was murdered, another individual was injured, seriously injured, and two others could have been injured, the Court does, in fact, consider [the Defendant] a dangerous offender;" therefore, it sentenced him consecutively, assigning him a life sentence plus fifteen years.

We note that the trial court failed to make *Wilkerson* findings, but nevertheless, we conclude that the trial court properly ran the Defendant's sentences consecutively. The Defendant kept two guns in his residence that no one knew about, including his parents who lived above him. When the police arrived at the door to deliver an eviction warrant, he shot two officers almost immediately after opening the door. The Defendant shot one officer five times, killing him. He shot and wounded another officer so badly that the officer had to retire from the force due to the injuries. When the SWAT team arrived, the Defendant barricaded himself in the basement, refused to negotiate, and shot wildly at the officers. After the Defendant was made to leave by distraction devices, he wrestled with a SWAT team member and tried to get the officer's weapon. A lengthy

sentence is appropriate here to protect the public from the Defendant. Additionally, a sentence of life plus fifteen years would reasonably relate to the severity of the offenses the Defendant committed when he killed one police officer and wounded another. The evidence does not preponderate against the trial court's findings regarding sentencing, and the Defendant is not entitled to relief on this issue.

### III. Conclusion

This Court is of the opinion that the trial court's factual findings with respect to the expert testimony for the Defendant's insanity defense were ambiguous, preventing our review of the legal conclusion that the Defendant was not legally insane at the time of the offense. It is therefore, ordered and adjudged by this Court that the judgments in this case are remanded to the Criminal Court of Davidson County for the entry of an order clarifying its factual findings.

_____
ROBERT W. WEDEMEYER, JUDGE