IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2009

## VINCENT ROGER HARRIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-A-463     Mark J. Fishburn, Jr., Judge**

---

**No. M2008-01422-CCA-R3-PC - Filed November 5, 2009**

---

Petitioner, Vincent Roger Harris, appeals the dismissal of his post-conviction petition in which Petitioner alleged that his trial counsel rendered ineffective assistance of counsel in connection with the entry of his pleas of guilty, and that his guilty pleas were not voluntarily or knowingly entered. After a thorough review we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Vincent Roger Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katie Miller, Assistant District Attorney General; and Sarah Davis, Assistant District Attorney General,  for the appellee, State of Tennessee.

**OPINION**

I.  Background

        Petitioner was indicted for one count of first degree felony murder and one count of aggravated arson, both Class A felonies.  On December 1, 2005, Petitioner entered pleas of guilty to the lesser included offenses of voluntary manslaughter and arson, both Class C felonies.  As part of the negotiated plea agreement, Petitioner agreed to be sentenced as a Range III, persistent offender, to consecutive sentences of fifteen years for each conviction, for an effective sentence of thirty years.

        At the guilty plea submission hearing, the State offered the following factual basis for the pleas:

[O]n June the 30th, 2004, [Petitioner] came to the home of John McCullough, who was his father-in-law. Mr. McCullough lived at 1116 North Eighth Street here in Davidson County. [Petitioner] came to the home at approximately 1:00 a.m., Mr. McCullough came to the front door and [Petitioner] threw something on him that caused Mr. McCullough to catch on fire, it also caused the house to catch on fire. Ms. Sheila Harris, who was the wife of [Petitioner] and her two small sons were in the house and were barely able to escape with their lives. Mr. McCullough was severely burned over 75 percent of his body. He died on July the 2nd as a result of the burns he sustained on June the 30th. He was 75 years old. [Petitioner] had fled the scene and was apprehended in Florida and brought back to Tennessee. He admitted to setting Mr. McCullough on fire to several individuals.

At the guilty plea submission hearing, the trial court explained the length of sentence that would be imposed for each count and that the sentences would be served consecutively. Petitioner stated that pursuant to the negotiated plea agreement, he understood that he was being sentenced as a Range III, persistent offender, instead of a Range I, standard offender, and had no objection to the offender classification. The trial court explained to Petitioner the constitutional rights he was waiving by entering a plea of guilty, and Petitioner said that he understood the consequences of his plea. Petitioner acknowledged that he had reviewed the negotiated plea agreement with his trial counsel, that trial counsel explained the ramifications of his plea, that he understood the consequences of entering pleas of guilty to the charged offenses, and that he was satisfied with the assistance provided by trial counsel.

Petitioner stated that he was currently taking Haldol Decanoate and Zyprexa for his bipolar condition. Petitioner said that he was diagnosed as bipolar approximately ten years prior to the plea and he had taken prescription medicine for this condition periodically during the ten-year period. Petitioner stated that he had been taking Haldol Decanoate and Zyprexa consistently for "a little over a year." Petitioner told the trial court that the medicine did not affect his ability to think or understand. Petitioner denied that he was suffering from any of the symptoms of his bipolar condition and acknowledged that he felt "clearheaded." At the conclusion of the guilty plea submission hearing, the trial court accepted Petitioner's pleas of guilty and imposed the agreed upon sentences.

## II. Post-Conviction Hearing

At the post-conviction hearing, Dr. Rokeya S. Farooque, a forensic psychiatrist with the Middle Tennessee Mental Health Institute, testified that Petitioner was admitted to the Institute on August 26, 2004, for an in-patient forensic evaluation after he was charged with the current offenses. Following her evaluation, Dr. Farooque diagnosed Petitioner with Bipolar I disorder. Dr. Farooque, however, determined that Petitioner understood the charges against him and was competent to stand trial. Dr. Farooque also concluded that certain circumstances surrounding the commission of the offenses, such as Petitioner's delusional belief that the victim was attempting to kill Petitioner by

poisoning him, would support an insanity defense. Dr. Farooque recommended that Petitioner be hospitalized prior to trial to maintain his competency and to continue the psychiatric treatment.

Petitioner was readmitted to the Institute on December 17, 2004, and remained hospitalized until he entered his pleas of guilty on December 1, 2005. Dr. Farooque stated that Petitioner was prescribed Zyprexa twice a day to help control his delusional thoughts. Petitioner also received an injection of Haldol Decanoate every three weeks to help control different aspects of psychotic behavior including hallucinations and delusions. Dr. Farooque said that Zyprexa can cause drowsiness in some patients but that Haldol Decanoate did not have a sedative side effect.

Dr. Farooque stated that Petitioner responded well to his medication after he was admitted to the hospital in December 2004. Approximately six months after he was admitted, Petitioner began meeting with Dr. Farooque, her medical team, and Petitioner's trial counsel to discuss Petitioner's options, the plea bargaining process, the possibility of presenting an insanity defense should Petitioner choose to go to trial on the charges, and the potential range of sentences. Dr. Farooque said that Petitioner understood the ramifications of entering pleas of guilty and the terms of his guilty plea agreement. Dr. Farooque said that these discussions occurred approximately four times a month for six months. Dr. Farooque stated that Petitioner's social worker, Rebecca Smith, also discussed the guilty plea submission procedure with Petitioner.

Dr. Farooque stated that she left orders for Petitioner to be administered a dose of Zyprexa on December 1, 2005, before he left for the guilty plea submission hearing, but Petitioner refused to take the medicine. Petitioner told the nurse that Zyprexa made him feel groggy, and he wanted to be alert for the hearing.

On cross-examination, Dr. Farooque stated that although Petitioner displayed delusional beliefs and acted on those delusions, other circumstances surrounding the commission of the offenses weighed against the successful presentation of an insanity defense. For example, Dr. Farooque said that Petitioner's flight to Florida after the commission of the offenses indicated that Petitioner appreciated the criminal nature of his conduct and wished to avoid arrest and prosecution for his conduct. Dr. Farooque reiterated that the presentation of an insanity defense was discussed with Petitioner prior to the entry of his pleas of guilty. Dr. Farooque said that Petitioner knew that his trial counsel and the State were working toward a negotiated plea agreement and that Petitioner was aware that he could be sentenced to life if he was found guilty of first degree felony murder after a trial.

Petitioner testified that he did not recall discussing a negotiated plea agreement with either trial counsel or Dr. Farooque until approximately two months before the guilty plea submission hearing. Petitioner stated that he met with trial counsel approximately three times while he was hospitalized at the Middle Tennessee Mental Health Institute. Petitioner said that trial counsel "briefly" mentioned the possibility of presenting an insanity defense at trial, but trial counsel told Petitioner that "it was hard to defend it in court." Petitioner stated, however, that he had previously been charged with attempted murder and had been found not guilty by reason of insanity.

Petitioner said that Haldol Decanoate was prescribed because he did not want to take his other medications, and Haldol made him lethargic and sleepy so that he would comply with the doctor's orders. Petitioner said that he refused to take Zyprexa on the day of the guilty plea submission hearing because Zyprexa increased the sleepiness he already was experiencing from the Haldol injection. Petitioner said that Dr. Farooque's testimony that Haldol Decanoate did not induce sleepiness was erroneous. Petitioner insisted that he gained approximately forty pounds because all he did was "sleep, sleep and eat."

Petitioner said that he was groggy during the guilty plea submission hearing because of the Haldol Decanoate. Petitioner acknowledged that he understood that he was entering pleas of guilty on December 1, 2005, but he stated that he had no independent recollection of the questions posed by the trial court during the hearing. Petitioner said that trial counsel advised him to only answer "yes" or "no." Petitioner stated that he did not remember signing the negotiated plea agreement. Petitioner denied that trial counsel read the agreement to him or showed him any paperwork connected with his case.

Petitioner stated that he believed he entered pleas of guilty to first degree felony murder and aggravated arson in exchange for an effective thirty-year sentence. Petitioner said that he did not find out that he had pled guilty to the lesser offenses of voluntary manslaughter and arson until approximately one year later because it took that long for the effects of the Haldol Decanoate to wear off. Petitioner stated that he was prescribed Resperdal in prison instead of Haldol Decanoate and Zyprexa. Petitioner said that unlike Haldol Decanoate which made him sleep all day, Resperdal did not cause sleepiness so that he was able to work on his case.

Petitioner acknowledged that he knew he was facing the possibility of sentences of life and twenty-five years if convicted of the charged offenses. Petitioner stated, however, that he did not understand the range classification system used in sentencing. Petitioner acknowledged that he agreed to serve forty-five percent of his effective sentence before he was eligible for parole, but he said that he did not know that he had agreed to be sentenced as a Range III, persistent offender. Petitioner said that if he had known he was classified as a Range I, standard offender, for sentencing purposes, he would not have agreed to enter pleas of guilty as a Range III, persistent offender.

Petitioner said that trial counsel told him that an insanity defense would not be successful at trial because of a change in the law. Petitioner, however, said that the insanity defense was successful against an earlier attempted murder charge after he "cut a man up with a machete." Petitioner said that the trial court in that case committed him to a mental hospital for three years. Petitioner stated that he was not aware that Dr. Farooque had found support for an insanity defense until his mother sent him his medical records approximately one year after the entry of his pleas of guilty. Petitioner said that if he had known that there was evidence supporting an insanity defense, he would not have entered his pleas of guilty.

Petitioner stated that if the trial court allowed him to withdraw his pleas of guilty, "a whole lot of information" would be revealed at trial. Petitioner said that the jury would learn that he had

survived the victim's attempt to poison him with arsenic, that the victim had tried to get Petitioner to fight with him so the victim could shoot Petitioner, and that the victim had taken a contract out on Petitioner's life. Petitioner stated, "There is no way I can explain to [my wife] why I killed her father, even though now I realize what I did was wrong." Petitioner said that he believed "[w]e just live in a society now where some people will push you over the limit." Petitioner stated, however, that he "would rather spend his life in the penitentiary than have to back to the mental institution and be forced to take medications."

On cross-examination, Petitioner acknowledged that he was aware that he could be committed to a mental hospital if he were found not guilty by a jury by reason of insanity. Petitioner, stated, however, that he did not believe that he would spend the rest of his life in a hospital under that scenario. Petitioner insisted that he killed the victim because the victim was trying to kill him. Petitioner maintained, however, that at trial he would rely on the insanity defense instead of arguing that he acted in self-defense. Petitioner initially said that his wife and children were in no danger when he set the victim on fire, but then acknowledged that he did not "stop to even think about [his] wife or children, [he] just wanted [the victim]."

At the end of his cross-examination, Petitioner said that he would not be granted parole because he "set a man on fire." Petitioner stated:

I have asked my lawyer to ask the State, to keep from having to incur a trial, to allow me to plead within my range. Range I for voluntary manslaughter and arson carries three to six years. If the State and I can reach an agreement, then I will consider pleading within my range, to a Range I, at [thirty] percent. A 12-year sentence or something within the Range I. I don't really want to put my wife or her family through a trial, and I just wanted to say that.

In response to the post-conviction court's question, Petitioner stated that he agreed to accept a thirty-year sentence because he believed that if he was convicted after a trial, he faced an effective sentence of life plus twenty-five years.

Trial counsel testified that he graduated from law school in 1976 and that the majority of his career was spent either prosecuting or defending those charged with criminal offenses. Trial counsel said that he was first appointed to represent Petitioner in 1994 when Petitioner was charged with attempted murder. After Petitioner was apprehended in Florida in 2004 on the current charges, trial counsel said that he contacted the Florida sheriff's department where Petitioner was being held and informed them that Petitioner was represented by counsel. When Petitioner was returned to Tennessee, trial counsel met with him at the Davidson County Jail approximately five times before Petitioner was admitted to the Middle Tennessee Mental Health Institute for a forensic evaluation.

Trial counsel said that he forwarded information to the Institute concerning the forensic evaluation performed in 1994 as well as his personal observations about Petitioner which trial counsel gleaned from their meetings. Trial counsel said that he met with Petitioner between fifteen

and twenty times while he was hospitalized. Trial counsel said that he also met with Dr. Farooque and her medical team twice to discuss issues concerning Petitioner's competency to stand trial and the possibility of an insanity defense.

Trial counsel said that he and Petitioner discussed the issues surrounding his charges, and trial counsel felt that Petitioner understood the discussions despite taking several medications for his mental condition. Trial counsel said that he kept the meetings short and went more frequently in order to ensure that Petitioner understood the issues. Trial counsel stated that Petitioner asked appropriate questions during these discussions. Trial counsel said that he discussed the plea negotiations with Petitioner, and the efforts to reach an agreement as to the convicting offenses and the length of the sentences. Petitioner understood that the State would not allow him to enter pleas of guilty to the lesser offenses of voluntary manslaughter and arson as a Range I, standard offender.

Trial counsel said that he also discussed with Petitioner the Institute's report listing the factors for and against the possible success of an insanity defense. Trial counsel pointed out that the report was contradictory in that the medical team concluded in one section that there were factors that would support an insanity defense but then stated in another section that Petitioner appreciated the wrongfulness of his conduct. Trial counsel said that he did not believe that Petitioner would ultimately prevail on an insanity defense.

Trial counsel said that he and Petitioner discussed the presentation of an insanity defense on several occasions, particularly in light of the fact that Petitioner had been found not guilty of attempted murder by reason of insanity in 1994. Trial counsel explained to Petitioner that the statutory amendments that went into effect in 1995 narrowed the availability of the defense to those who were unable to appreciate the nature or wrongfulness of their conduct because of a severe mental disease or defect. In addition, under the 1995 amendments, the defendant had the burden of proving the defense of insanity by clear and convincing evidence. Based on his review, trial counsel believed that an insanity defense would ultimately prove unsuccessful.

On cross-examination, trial counsel acknowledged that Petitioner displayed similar psychotic behavior in 1994 as in 2004. That is, Petitioner had the delusional belief that the victims of both offenses were trying to kill him, and Petitioner acted to defend himself. Trial counsel said that he had observed Petitioner when he was not on medication both in 1994 and again in 2004, and Petitioner displayed the same type of behavior. Trial counsel said that he did not believe that Petitioner was initially competent to stand trial. Trial counsel said that after Petitioner began taking the prescribed medication, however, his thought processes became more orderly and his speech pattern more controlled, although Petitioner continued to maintain the belief that his father-in-law had tried to poison him.

Trial counsel said that he shared the medical staff's conference report and evaluation with Petitioner and on several occasions discussed the reasons why trial counsel believed an insanity defense would not ultimately be successful. Trial counsel also shared the State's evidence with Petitioner and discussed the concept of range classifications. Trial counsel said that the State

initially offered to settle the charges for an effective sentence of thirty years with a one hundred percent eligibility release date. Trial counsel said that he made a counter offer based on the Range III offender classification in an effort to reach a compromise on the length of the sentence. Trial counsel said that according to his case notes which were introduced as an exhibit at the hearing, trial counsel discussed with Petitioner on September 21, 2005, the possibility of entering pleas of guilty to voluntary manslaughter and arson for consecutive fifteen-year sentences "at 45% out of range." Trial counsel said that he noted, "[Petitioner] is interested." Trial counsel also recollected discussing the concept of diminished capacity with Petitioner as well as the possibility of being convicted of a lesser included offense.

Trial counsel acknowledged that the trial court's statement during the guilty plea submission hearing that Petitioner could be sentenced to twenty-five years for a Class C felony was incorrect. Trial counsel stated that he probably did not hear that statement because he would have corrected the trial court if he had.

## III. Standard of Review

To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in the petition by clear and convincing evidence. T.C.A. § 40-30-210(f). However, the trial court's application of the law to the facts is reviewed de novo, without a presumption of correctness. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. Id.; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he or she must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he or she must show that counsel's ineffective performance actually adversely impacted his defense. Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. Id. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the Strickland test before he or she may prevail on a claim of ineffective assistance of counsel. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his or her counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. Id. Failure to satisfy either prong will result in the denial of relief. Id. Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. Strickland, 466 U.S. at 697, 104 S. Ct. at

2069. In cases involving a guilty plea, the petitioner must show prejudice by demonstrating that, but for counsel's errors, he or she would not have pleaded guilty but would have insisted on going to trial. See Hill v. Lockhart, 474 U.S. 42, 59, 106 S. Ct. 366, 370 (1985); Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

## IV. Ineffective Assistance of Counsel

Petitioner argues that his trial counsel's assistance before and during the guilty plea submission process was ineffective because trial counsel failed to share any discovery pertaining to his case, and failed to advise Petitioner of his options. Specifically, Petitioner contends that he was unaware that an insanity defense to the charged offenses was available, and that he did not understand that he could have been sentenced as a Range I, standard offender, if he had been convicted by a jury.

Both trial counsel and Dr. Farooque testified that they discussed the possibility of an insanity defense with Petitioner on numerous occasions. Trial counsel stated that he shared Dr. Farooque's final conference report with Petitioner and discussed the factors listed in the report which were favorable to the success of an insanity defense and those factors which were unfavorable. Trial counsel said that he explained to Petitioner that the law governing an insanity defense had changed since Petitioner was found not guilty by reason of insanity of attempted murder in 1994. See State v. Flake, 88 S.W.3d 540, 550 -551 (Tenn. 2002) (outlining the significant changes in the insanity defense after the 1995 amendments to T.C.A. § 39-11-501). Trial counsel said that Dr. Farooque concluded that Petitioner appreciated the wrongfulness of his conduct, and trial counsel advised Petitioner that he did not believe that an insanity defense would ultimately be successful. Trial counsel stated at the hearing that he shared with Petitioner the State's response to the motion for discovery.

The post-conviction court found credible the testimony of trial counsel and Dr. Farooque that Petitioner was fully informed of the pros and cons of pursuing an insanity defense should he choose to proceed to trial, and that Petitioner was informed about the State's evidence against him. Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel's assistance in this regard was not deficient.

Petitioner acknowledged at the post-conviction hearing that he understood that his plea agreement called for a forty-five percent release eligibility date for his sentences. Petitioner also acknowledged that while in prison, he read Hicks v. State, 945 S.W.2d 706, 709 (Tenn.1997) (holding that a plea-bargained Range II sentence is valid when coupled with a Range I release eligibility) and believed that his sentence was legal. Petitioner argues on appeal, however, that trial counsel rendered ineffective assistance of counsel because he did not inform Petitioner that he was being sentenced as a Range III, persistent offender, instead of a Range I, standard offender.

Trial counsel testified at the evidentiary hearing that the plea negotiations centered on the convicting offenses to which Petitioner would enter pleas of guilty and the length of the sentences.

Trial counsel said that the State initially offered an effective sentence of thirty years with a 100% release eligibility date. Trial counsel testified that he explained the various range classifications for sentencing purposes to Petitioner, and Petitioner was willing to accept an offer that included a 45% release eligibility date as a Range III, persistent offender.

At the guilty plea submission hearing, the following colloquy occurred:

| | |
|---|---|
| THE COURT: | I understand you're going to be pleading guilty in count one to the lesser included offense of voluntarily [sic] manslaughter, and in count two to the lesser included offense of arson. You're going to be sentenced in each of those cases to 15 years as a range three offender at 45 percent. Those sentences will run consecutively to one another for a total effective sentence of 30 years as a range three offender 45 percent; is that your understanding, sir, of what you're pleading to as well as the actual punishment being imposed. |
| [PETITIONER]: | Yes, sir. |
| THE COURT: | [Petitioner], I understand that the agreement that you have reached is calling upon you to enter a plea of guilty to a sentence beyond that which the law would allow us to impose in the event that you were found guilty at the trial. If you had gone [to] trial and found guilty – is he a range one? |
| [DEFENSE COUNSEL]: | (Nodded affirmative). |
| THE COURT: | If you had gone to trial and were found guilty of these particular offenses, not the ones you're charged with, but the ones to which you are pleading, then the maximum that I could impose under the law would be 25 [sic] years on each of those sentences as a range one offender at 30 percent. The sentence that you're entering the pleas on will be at a 45-percent range rather than a 30-percent range; do you understand that? |
| [PETITIONER]: | Yes, sir. |

The post-conviction court implicitly found credible trial counsel's testimony that he informed Petitioner that the State would not accept his pleas of guilty to lesser included offenses as a Range I, standard offender. The post-conviction court found that even if Petitioner was unaware that he was being sentenced as a Range III, persistent offender, Petitioner failed to establish any prejudice. Petitioner acknowledged that he was aware that the indicted offenses carried potential sentences of life and twenty-five years, and that he was entering his pleas of guilty to the lesser offenses of voluntary manslaughter and arson with a forty-five percent release eligibility date instead of a thirty percent release eligibility date. The post-conviction court found that "the record is replete with Petitioner's acknowledgment that he was pleading as a Range III offender." Based on our review we conclude that the record supports the post-conviction court's finding that Petitioner failed to show that his trial counsel's assistance was deficient or that he was prejudiced in this regard. Petitioner is not entitled to relief on this issue.

## V. Entry of Guilty Pleas

When an accused enters a plea of guilty, constitutional considerations mandate that the plea be voluntarily, understandingly and knowingly entered. See Boykin v. Alabama, 395 U.S. 238, 243, 89 S. Ct. 1709, 1713 (1969); State v. Mackey, 553 S.W.2d 337 (Tenn. 1997). By entering a plea, the defendant waives certain constitutional rights including the privilege against self-incrimination, the right to a trial by jury, and the right to confront witnesses. Boykin, 395 U.S. at 243, 89 S. Ct. at 1714. The defendant's waiver of these constitutional rights may not be presumed from a silent record. Id. A plea cannot be voluntary if the accused is "incompetent or otherwise not in control of his mental facilities" at the time the plea is entered. Blankenship v. State, 858 S.W.2d 897, 904-05 (Tenn. 1993) (quoting Brown v. Perini, 718 F.2d 784, 788 (6th Cir. 1983)). The trial court must ascertain if the defendant fully understands the significant consequences of his or her plea. State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1977). The trial court may consider a number of factors including the defendant's relative intelligence, his or her familiarity with criminal proceedings, whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about options, the advice give by counsel and the trial court about the charges against the defendant and the penalty to be imposed, and the defendant's reasons for pleading guilty. Blakenship, 858 S.W.2d at 904.

Petitioner argues that his pleas of guilty were not knowingly entered into because he was "heavily medicated" on the day of the guilty plea submission hearing, and the trial court misinformed him of the maximum punishment for a Class C felony.

Petitioner contends that he was so groggy on the morning of the hearing that he did not even recollect the questions posed by the trial court. Dr. Farooque testified that Haldol Decanoate did not make a patient sleepy or groggy. Although Zyprexa can make a patient feel sleepy, Petitioner refused to take the scheduled dose of Zyprexa on the morning of the hearing because he wanted to be "clear headed." At the guilty plea submission hearing, the following colloquy occurred:

-10-

| | |
|---|---|
| THE COURT: | The medications that you're taking, are they having any adverse effect on your ability to think and understand clearly and rationally? |
| [PETITIONER]: | No. |
| THE COURT: | You know what you're doing and why you're here? |
| [PETITIONER]: | Yes, sir. |
| THE COURT: | All right. The underlying mental condition that you have, the bipolar condition, are you currently suffering from any of the symptoms normally related to that particular condition. |
| [PETITIONER]: | No. |
| THE COURT: | You're not ready to start climbing the wall? |
| [PETITIONER]: | No. |
| THE COURT: | Not in a depressed state? |
| [PETITIONER]: | No. |
| THE COURT: | You feel like you're clearheaded? |
| [PETITIONER]: | Yes. |

The post-conviction court found credible Dr. Farooque's testimony that Haldol Decanoate would not have made Petitioner groggy or drowsy on the morning of the guilty plea submission hearing, and trial counsel's testimony that, although he believed Petitioner "still had delusional thinking, [trial counsel] did not believe [Petitioner] was suffering from any delusions that would interfere with [his] ability to enter his plea." The trial court thoroughly questioned Petitioner as to his mental status on the day of the hearing, and Petitioner testified that he was not suffering any detrimental effects from either his bipolar condition or his medication. The record supports the post-conviction court's finding that Petitioner's medication did not render his guilty pleas involuntary.

Petitioner argues that his pleas of guilty were not knowingly entered into because the trial court misinformed him that the maximum sentence for a Class C felony was twenty-five years. Petitioner contends that he would not have entered his pleas of guilty if he had known that the maximum sentence for a Class C felony, Range I, standard offender, was six years.

-11-

The post-conviction court acknowledged that its statement during the guilty plea submission hearing that the maximum sentence for a Class C felony, Range I, standard offender was twenty-five years was erroneous. The post-conviction court, however, found that the petition to enter a plea of guilty, which was signed by Petitioner, set forth the range of punishment for the offenses of voluntary manslaughter and arson. The post-conviction court also found that Petitioner testified at the guilty plea submission hearing that he had read the petition, and that he "fully and completely under[stood] the contents of the petition." The post-conviction court found that:

> [a]dditionally, both [trial counsel] and Dr. Farooque testified that the plea agreement was discussed in great detail before his court appearance and that [Petitioner] fully understood the terms of the plea. Finally, this Court made [Petitioner] aware that the sentence being imposed pursuant to the plea agreement was a greater sentence than the Court was authorized by law to impose, notwithstanding its incorrect statement of the amount of maximum exposure.

Based on our review, we conclude that the evidence does not preponderate against the trial court's finding that Petitioner's guilty pleas were knowing, voluntary, and intelligent. Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we conclude that the evidence does not preponderate against the post-conviction court's findings that trial counsel's assistance was effective and that Petitioner's pleas of guilty were voluntary and knowing. We, therefore, affirm the judgment of the trial court in dismissing Petitioner's petition for post-conviction relief.

_____
THOMAS T. WOODALL, JUDGE